

# In the Missouri Court of Appeals
# Eastern District

### DIVISION ONE

| | | |
|---|---|---|
| S.M.S., | ) | No. ED105760 |
| | ) | |
| Respondent/Cross-Appellant, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | 13SL-DR04529 |
| | ) | |
| J.B.S., | ) | Honorable Kristine A. Kerr |
| | ) | |
| Appellant/Cross-Respondent. | ) | Filed:  July 30, 2019 |

J.B.S. ("Husband") appeals portions of the trial court's May 30, 2017 amended dissolution judgment pertaining to the classification of certain stock, retained earnings, and funds in a bank account as marital property.  S.M.S. ("Wife") cross-appeals portions of the trial court's May 30, 2017 amended dissolution judgment pertaining to, (1) the classification of an ownership interest in an LLC and certain stock as Husband's separate property; and (2) the valuations of stock.  We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.[1]

---

[1] Husband filed five separate notices of appeal indicating he was appealing:  (1) the trial court's May 30, 2017 amended dissolution judgment, (2) the trial court's May 9, 2017 judgment granting Wife's motion for attorney's fees on appeal and suit money pendente lite; (3) the trial court's May 9, 2017 judgment granting Wife's motion to compel and for attorney's fees; (4) the trial court's August 18, 2017 judgment granting Wife's motion for attorney's fees on appeal and suit money pendente lite; and (5) the trial court's July 17, 2017 judgment granting Wife's motion to hold Husband in civil contempt of court for, *inter alia*, failing to pay court-ordered child support.  Our Court consolidated Husband's five separate notices of appeal with Wife's single notice of appeal indicating she was appealing the trial court's May 30 amended dissolution judgment.  Husband and Wife subsequently filed briefs raising points of error with respect to the trial court's May 30 amended dissolution judgment.  However, Husband's brief fails to raise any points of error with respect to the trial court's May 9, August 18, or July 17 decisions.  Accordingly, Husband's appeals of the May 9, August 18, and July 17 decisions are deemed abandoned and are hereby dismissed.  *See Sulkin v. Sulkin*, 552 S.W.3d 793, 794 n.1 (Mo. App. E.D. 2018).

## I. BACKGROUND

**A.     Relevant Evidence Adduced at Trial and Disputed Issues on Appeal and Cross-Appeal**

Wife filed her petition for dissolution of marriage on July 30, 2013.  Husband answered and filed a cross-petition for dissolution on August 16, 2013.  Husband then filed his amended cross-petition for dissolution of marriage on July 24, 2015.  An eleven-day bench trial was held between December 7, 2015 and March 30, 2016, revealing the following facts.

Husband and Wife were married on September 18, 1993.  Two children were born of the marriage and remained unemancipated at the time of trial.[2]

The parties enjoyed substantial financial resources throughout the marriage.  In addition, there were multiple bank accounts opened during the marriage, including Business Bank Account x7520.  Except for evidence related to a disputed issue in Husband's appeal pertaining to the trial court's classification of Business Bank Account x7520 as marital property that is discussed in detail below in Section III.C. of this opinion, the relevant evidence adduced at trial and disputed issues on appeal and cross-appeal all relate to Husband's involvement in and/or ownership of three family businesses during the marriage:  Provider Plus, Inc. ("PPI"), Specialized Insurance Assistance ("SIA"), and Phoenix Wing, LLC ("Phoenix Wing").[3]

### 1.     PPI and SIA

#### a.     PPI

PPI is a closely-held and Subchapter S corporation originally founded by Husband's mother K.M.S. ("K.M.S. or "Mother") in the early 1990's.  PPI is a provider of medical equipment and supplies and has approximately 200 employees.  Husband's Mother, who passed away on November 1, 2012, was the sole shareholder of PPI through 2004.

---

[2] Because neither party has directly appealed issues relating to child custody or child support, all references to the children are only to provide context for the present appeal.

[3] We note it is undisputed that Wife did not provide any work or services for PPI, SIA, or Phoenix Wing.

During the parties' marriage and Husband's Mother's lifetime, Husband acquired a total of 235 shares of PPI stock and was employed by PPI. Husband first began working at PPI in the early 1990's, and he worked full-time at PPI throughout the course of the parties' marriage. After Mother's death on November 1, 2012, Husband became more involved in PPI, and his ownership of the company increased.

### i. The 235 shares of PPI stock Husband received during his Mother's lifetime

At the time of the trial, the 235 shares of PPI stock Husband acquired during the parties' marriage and Husband's Mother's lifetime represented a 23.5% ownership interest in PPI. At trial, both parties presented conflicting evidence as to the valuation of all outstanding shares of PPI stock and a valuation as to the 235 shares of PPI stock Husband acquired during the marriage. The trial court ultimately adopted Husband's expert's valuations of PPI stock, and whether the trial court erred in doing so is a disputed issue in Wife's cross-appeal.

Husband acquired 100 of the 235 shares of PPI stock directly from his Mother, specifically receiving: (1) 15 shares of voting common stock from his Mother on January 31, 2005; (2) 50 shares of non-voting common stock from his Mother on December 31, 2006; and (3) 35 shares of voting common stock from his Mother on August 1, 2012. Husband later transferred the previously-mentioned shares to his living trust dated February 20, 2008.

At trial, Husband claimed the 100 shares of PPI stock he received from his Mother were acquired by gift. Husband testified he provided no services, money, or property in exchange for the shares, and he took absolute ownership of the shares when they were transferred to him. In the instant case, it is undisputed that the trial court properly classified the 15 shares of voting common stock Husband received from his Mother on January 31, 2005 and the 50 shares of non-voting common stock Husband received from his Mother on December 31, 2006 as Husband's separate property because those shares were acquired by gift. However, one issue raised in

3

Wife's cross-appeal is whether the trial court erred in classifying the 35 shares of voting common stock Husband received from his Mother on August 1, 2012 as Husband's separate property on the basis the shares were acquired by gift.

The remaining 135 shares of PPI stock Husband acquired during the parties' marriage and Husband's Mother's lifetime were received by Husband on December 15, 2006, as a result of PPI issuing a document on that date titled "Unanimous Written Consent of the Sole Director [K.M.S.] of [PPI] in Lieu of a Special Meeting" ("PPI Consent"). The PPI Consent provides in pertinent part:

> . . . a dividend in the form of shares of [PPI's] non-voting common stock should be declared on the issued and outstanding shares of [PPI's] common stock.

> . . . [PPI] shall issue to the shareholders Nine (9) shares of its non-voting common stock, no par value, for each one (1) share of voting common stock, $1 par value . . ..

Before the PPI Consent was issued, Husband owned the 15 shares of voting common stock in PPI that he undisputedly acquired as a result of a gift from his Mother on January 31, 2005. After the PPI Consent was issued, Husband was the owner of 15 shares of voting common stock and 135 shares of non-voting common stock. Wife's expert, Frank Wisehart, testified the PPI Consent had the effect of "recapitalizing the shares" in PPI and resulted in Husband owning a total of 150 shares, which did not change Husband's percentage of ownership in PPI. One issue raised in Husband's appeal is whether the trial court properly classified the 135 shares as marital property on the basis the shares were acquired as a result of a stock dividend.

### ii. Husband's involvement in and ownership of PPI following his Mother's death

Following Husband's Mother's death, Husband remained employed by PPI and he became the President, Secretary, and a member of the Board of Directors of PPI. In addition, Husband's trust became the owner of 50% of PPI stock, and Husband's brother's ("Brother")

4

trust became the owner of the other 50% of PPI stock. Husband is the trustee of his trust and his Brother's trust.

Husband receives a salary and shareholder income from PPI. PPI did not distribute all of Husband's shareholder income for several years, including from 2013-2015 (the timeframe between when Wife filed her petition for dissolution of marriage and when the bench trial began, i.e., the pendency of the dissolution proceedings). As a result, PPI had a significant amount of retained earnings during those years. The testimony of Wayne Bircher, the certified public accountant ("CPA") for PPI, demonstrates that Husband, in his role as President of PPI, had the sole authority to order the company's retained earnings to be distributed to the shareholders of PPI during the pendency of the dissolution proceedings.

### b.     SIA

SIA is also a closely-held corporation originally founded by Husband's Mother in the early 1990's. SIA is a medical claims billing company that has one customer (PPI) and zero employees. Because PPI is SIA's only customer, all of SIA's revenue comes from PPI.

During Mother's lifetime, 100% of SIA stock was owned by Mother or her trust. After Husband's Mother's death, her trust created a trust for Husband and a trust for Husband's Brother, and subsequently, Husband's trust and his Brother's trust each owned 50% of the shares of SIA. Husband is the trustee of his trust and his Brother's trust.

Following his Mother's death, Husband became the President, Secretary, and a member of the Board of Directors of SIA. Although Husband does not receive a salary from SIA, he does receive shareholder income from the company. SIA did not distribute all of Husband's shareholder income for several years, including during the pendency of the dissolution proceedings (from 2013-2015). Accordingly, SIA had a significant amount of retained earnings during those years. The testimony of Wayne Bircher, the CPA for SIA, demonstrates that

5

Husband, in his role as President of SIA, had the sole authority to order the company's retained earnings to be distributed to the shareholders of SIA during the pendency of the dissolution proceedings.

### c. Relevant Parts of the Trial Court's Amended Dissolution Judgment Relating to Portions of Retained Earnings of PPI and SIA

In determining Husband's annual income for purposes of his monthly child support and maintenance obligations, the trial court considered, *inter alia*, portions of retained earnings from both PPI and SIA. The trial court ultimately found Husband's annual income was $1,509,120, i.e., $125,760 per month. In the instant case, neither party challenges the trial court's determination of Husband's annual income, the court's consideration of portions of Husband's retained earnings from PPI and SIA in determining his annual income, or the court's orders relating to child support and maintenance.

The trial court also considered portions of retained earnings of PPI and SIA in connection with the division of property, finding portions of retained earnings from both companies during the pendency of the dissolution proceedings (from 2013-2015) were marital property, even though Wife had also requested the trial court to classify the retained earnings from many more years as marital property.

With respect to PPI, the trial court ordered Wife to receive a total of $172,273 by way of a cash equalization payment from Husband. And with respect to SIA, the trial court ordered Wife to receive a total of $459,513 by way of a cash equalization payment from Husband. In the instant case, neither party challenges the trial court's calculations underlying either cash equalization payment; however, Husband does argue in his appeal that the trial court erred in classifying the portions of retained earnings of PPI and SIA as marital property and awarding Wife half of the value of the portions of retained earnings in each company.

6

### 2. Phoenix Wing

Phoenix Wing is a Missouri limited liability company formed during the parties' marriage by Husband, his Brother, and their Mother. After its formation, Phoenix Wing owned and managed commercial real estate in St. Charles County.

The operating agreement for Phoenix Wing provides Husband received a 49.5% ownership interest in Phoenix Wing in the form of 4,950 Non-Voting Class B Units on February 15, 2006, a date which occurred during the parties' marriage. On February 20, 2008, the date Husband's living trust was created, Husband transferred his 49.5% ownership interest in Phoenix Wing to his living trust.

There was conflicting evidence adduced at trial as to how Husband acquired his 49.5% ownership interest in Phoenix Wing. On the one hand, the Operating Agreement indicates Husband received his 49.5% ownership interest in Phoenix Wing in February 2006 in exchange for Husband making a capital contribution of $247.50. In contrast, Husband testified at trial that his Mother gifted him his 49.5% ownership interest in Phoenix Wing in 2006, and he did not provide any capital contribution, money, or services in exchange for the interest. One of the issues raised in Wife's cross-appeal is whether the trial court erred in classifying the 49.5% ownership interest as Husband's separate property on the basis the interest was a gift to Husband from his Mother.

### B. Relevant Procedural Posture Including the Trial Court's Amended Dissolution Judgment

The trial court issued an initial dissolution judgment on February 9, 2017. Husband and Wife each filed a post-trial motion requesting the court to, *inter alia*, amend the initial dissolution judgment. Subsequently, on May 30, 2017, the trial court entered the amended dissolution judgment at issue in the instant case.

Husband appeals portions of the trial court's amended dissolution judgment which: (1) classifies the 135 shares of non-voting common stock in PPI that Husband received on December 15, 2006 as a result of the PPI Consent as marital property and awards Wife half of the value of the shares on the basis the shares were acquired as a result of a stock dividend; (2) classifies portions of the retained earnings of PPI and SIA as marital property and awards Wife half of the value of the portions of the retained earnings in each company; and (3) classifies Business Bank Account x7520 as marital property and awarding Wife half of the value of the account.

Wife cross-appeals portions of the trial court's amended judgment which: (1) classifies the 49.5% ownership interest in Phoenix Wing and 35 shares of voting common stock in PPI that Husband received on August 1, 2012 as Husband's separate property on the basis the ownership interest and shares were acquired by gift; and (2) adopts Husband's expert's valuation of all outstanding shares of PPI stock and his valuation as to the 235 shares of PPI stock Husband acquired during the marriage.[4]

## II.    GENERAL STANDARD OF REVIEW

As with any court-tried case, an appellate court reviews a trial court's dissolution judgment pursuant to *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976). *Landewee v. Landewee*, 515 S.W.3d 691, 694 (Mo. banc 2017). Accordingly, we will affirm the trial court's decision unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id*.

"Substantial evidence is evidence that, if believed, has some probative force on each fact necessary to sustain the trial court's judgment." *Day v. Hupp*, 528 S.W.3d 400, 411 (Mo. App. E.D. 2017). Evidence is considered to have probative force when it has a tendency to make a

---

[4] To avoid unnecessary repetition, the trial court's specific findings of fact and conclusions of law, along with other additional facts, will be set out in relevant part in our discussion of Husband's points on appeal and Wife's points on cross-appeal in Sections III. and IV. of this opinion.

material fact more or less likely. *Id.* When our Court reviews whether the trial court's decision is supported by substantial evidence, we view the evidence and inferences therefrom in the light most favorable to the trial court's judgment and disregard all contrary evidence and inferences. *Id.* In addition, because the trial court is free to believe any, all, or none of the testimony and other evidence presented at trial, we defer to the trial court's credibility determinations. *Id.* Ultimately, the trial court's judgment is supported by substantial evidence when "the evidence and inferences favorable to the challenged proposition have probative force upon the proposition and constitute evidence from which the trier of fact can reasonably decide that the proposition is true." *Id.*

On the other hand, a claim that the trial court's judgment is against the weight of the evidence presupposes there is sufficient evidence to support the judgment, and our Court will reverse the judgment under this standard of review only in rare cases when we have a firm belief the trial court's decision is wrong. *Id.* at 411-12. When our Court reviews whether the trial court's decision is against the weight of the evidence, "we defer to the trial court's findings of fact when the factual issues are contested and when the facts as found by the trial court depend on credibility determinations." *Id.* at 412. Nevertheless, when reviewing an against-the-weight-of-the-evidence challenge "we can consider evidence contrary to the trial court's judgment that is not based on a credibility determination." *Id.* Furthermore, as recently stated by this Court:

> A trial court's judgment is against the weight of the evidence only if the court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. When the evidence poses two reasonable, although different conclusions, we must defer to the trial court's assessment of that evidence.

*Id.* (citation omitted).

In addition, the trial court is vested with broad discretion in classifying, valuing, and dividing marital property in a dissolution proceeding, and an appellate court will interfere with

9

the trial court's decision only if it constitutes an abuse of discretion. *Landewee*, 515 S.W.3d at 694; *Cule v. Cule*, 457 S.W.3d 858, 864-65 (Mo. App. E.D. 2015); *Torrey v. Torrey*, 333 S.W.3d 34, 36 (Mo. App. W.D. 2010). "An abuse of discretion occurs when a trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to indicate indifference and a lack of careful judicial consideration." *Torrey*, 333 S.W.3d at 36 (quotations omitted). Moreover, if reasonable persons can differ about the propriety of the trial court's decision, then it cannot be said the trial court abused its discretion. *Id*.

Finally, in reviewing a court-tried dissolution case, our Court is predominately concerned with the correctness of the trial court's ruling rather than the route taken to reach it. *McQueen v. Gadberry*, 507 S.W.3d 127, 132, 138 (Mo. App. E.D. 2016). "Therefore, we are obliged to affirm if we determine that the trial court reached the correct result, regardless of whether the trial court's proffered reasons are wrong or insufficient." *Id.* (quotations omitted).

## III. DISCUSSION OF HUSBAND'S POINTS ON APPEAL

Husband raises four points on appeal. Husband's first point on appeal claims the trial court abused its discretion in classifying the 135 shares of non-voting common stock in PPI that Husband received on December 15, 2006 as a result of the PPI Consent as marital property and awarding Wife half of the value of the shares on the basis the shares were acquired as a result of a stock dividend. Husband's second and third points on appeal assert the trial court abused its discretion in classifying portions of the retained earnings of PPI and SIA as marital property and awarding Wife half of the value of portions of the retained earnings in each company. And Husband's fourth point on appeal contends the trial court abused its discretion in classifying Business Bank Account x7520 as marital property and awarding Wife half of the value of the account.

10

**A.**     **Whether the Trial Court Abused its Discretion in Classifying 135 Shares of Non-Voting Common Stock in PPI as Marital Property and Awarding Wife Half of the Value of the Shares on the Basis the Shares were Acquired as a Result of a Stock Dividend**

In Husband's first point on appeal, he claims the trial court abused its discretion in classifying the 135 shares of non-voting common stock in PPI that Husband received on December 15, 2006 as a result of the PPI Consent as marital property and awarding Wife half of the value of the shares on the basis the shares were acquired as a result of a stock dividend. Husband contends the 135 shares were acquired as a result of a stock split, and therefore, should have properly been classified as his separate property.

**1.     General Law**

"Property acquired during the marriage is presumed to be marital property, but a party may overcome this presumption if he or she shows the property is separate." *Id*. at 136 n.10, 151 (citing, *inter alia*, sections 452.330.2 and .3 RSMo 2000[5]). The spouse asserting property is separate has the burden to overcome the presumption of marital property and demonstrate by clear and convincing evidence that the property falls under one of the exceptions set out in section 452.330.2. *McQueen*, 507 S.W.3d at 151. Furthermore, if the complaining party meets this burden, the property is rendered separate. *Id*.

One of the exceptions listed in section 452.330.2 is property that, *inter alia*, is "acquired . . . in exchange for property acquired by gift[,]" i.e., property which is acquired in exchange for separate property. Section 452.330.2(2); *see also* section 452.330.2(1) and *Fike v. Fike*, 509 S.W.3d 787, 802 (Mo. App. E.D. 2016) (property a spouse acquires by gift subsequent to the marriage is considered to be his separate property).

When a spouse acquires additional shares of stock during the marriage by a stock split issued on original shares of stock that were gifted to the spouse subsequent to the marriage, the

---

[5] All further references to section 452.330 are to RSMo 2000, which is the latest version of the statute.

additional shares constitute property "acquired . . . in exchange for property acquired by gift" under section 452.330.2(2) and the additional shares are properly classified as the spouse's separate property.  *See Hoffmann v. Hoffmann*, 676 S.W.2d 817, 822 (Mo. banc 1984); *In re Marriage of Bruske*, 656 S.W.2d 288, 295 (Mo. App. W.D. 1983); section 452.330.2(2); *see also Davis v. Davis*, 107 S.W.3d 425, 434 (Mo. App. E.D. 2003); *Welch v. Welch*, 821 S.W.2d 560, 561 (Mo. App. E.D. 1991); *Drikow v. Drikow*, 803 S.W.2d 122, 127 (Mo. App. E.D. 1990). "Whether by a surrender of the certificate evidencing the original number of shares for a certificate in the new amount of shares, or by receipt of an additional certificate reflecting added shares owned, the [stock split] transaction is an exchange of one number of shares for another." *Bruske*, 656 S.W.2d at 295.

However, when a spouse acquires additional shares of stock during the marriage by a stock dividend issued on original shares of stock that were gifted to the spouse subsequent to the marriage, the additional shares do not fall within the statutory exception in section 452.330.2(2) but instead are considered income, and therefore, the additional shares are properly classified as marital property.  *Davis*, 107 S.W.3d at 434-35; *Welch*, 821 S.W.2d at 561; *Drikow*, 803 S.W.2d at 127.  "A stock dividend is a dividend paid in stock instead of cash, and is properly payable only out of surplus." *Whetsel v. Forgey*, 20 S.W.2d 523, 528 (Mo. 1929).

2.     **Relevant Facts**

During the parties' marriage, and specifically on January 31, 2005, Husband acquired 15 shares of voting common stock in PPI and they were issued in Husband's individual name. Based on the evidence adduced at trial, the trial court found the 15 shares of voting common stock were gifted to Husband by his Mother, and therefore, the court classified the 15 shares as Husband's separate property.  Wife does not challenge these findings on cross-appeal.

On December 15, 2006, a date which occurred during the parties' marriage, PPI issued the PPI Consent, which is titled in full as "Unanimous Written Consent of the Sole Director [K.M.S.] of [PPI] in Lieu of a Special Meeting." The PPI Consent, which is part of the record on appeal, is signed by, (1) K.M.S. (Husband's Mother) as the sole director of PPI, and (2) all two shareholders of PPI: Husband and K.M.S., Trustee of the K.M.S. Living Trust dated October 6, 1993. Furthermore, the PPI Consent provides in pertinent part:

> [K.M.S.], being the sole director of [PPI], a Missouri corporation . . ., acting pursuant to the General Business Corporation Law of Missouri, as amended, consents to the adoption of the following resolutions in lieu of holding a special meeting:
>
> WHEREAS, [PPI] has authorized a class of [voting] common stock, $1 par value, and a class of non-voting common stock, no par value; and
>
> WHEREAS, the undersigned has determined that a *dividend* in the form of shares of [PPI's] non-voting common stock should be declared on the issued and outstanding shares of [PPI's] common stock.
>
> RESOLVED, that *[PPI] shall issue to the shareholders Nine (9) shares of its non-voting common stock, no par value, for each one (1) share of voting common stock, $1 par value*, held by such shareholder as of the date hereof, which shares of non-voting common stock shall be deemed fully paid and non-assessable upon such issuance, which shall be the 15th day of December 2006; and
>
> FURTHER RESOLVED, that the proper officers of [PPI] are authorized, empowered, and directed to execute and deliver certificates for shares of [PPI's] common non-voting stock and to take all other actions necessary or convenient to effect the foregoing resolution.

(emphasis added).

As of the date the PPI Consent was issued, which was December 15, 2006, Husband was the owner of 15 shares of voting common stock and 135 shares of non-voting common stock. Wife's expert, Frank Wisehart, testified the PPI Consent had the effect of "recapitalizing the shares" in PPI and resulted in Husband owning a total of 150 shares, which did not change Husband's percentage of ownership in PPI. Wisehart also testified the 135 shares of non-voting common stock were issued as a result of a "stock split" rather than a dividend, and the 135 shares

13

were directly traceable to the 15 shares of voting common stock Husband had obtained as a gift from his Mother in 2005.

Relying solely on the PPI Consent's mere usage of the word "dividend," the trial court classified the 135 shares of non-voting common stock as marital property on the basis they were acquired as a result of a "stock dividend." In addition, the trial court awarded Wife a cash payment of $736,695 for what the court found to be her portion of the value of these shares, specifically finding: (1) "[t]he 135 shares of [PPI] non-voting stock are marital property and must be divided in an equitable manner"; (2) "the 135 shares of [PPI] non-voting stock are valued at $1,473,390 ([e]ach individual share of non-voting stock is worth $10,914)"; and (3) "Wife requests a cash payment for her portion of the [PPI] stock. The [c]ourt grants Wife's prayer for relief and awards her 50% of the value, or $736,695 for her portion of the 135 shares [of] [PPI] stock."

### 3. Analysis of the Parties' Arguments on Appeal and the Trial Court's Judgment

In this case, it is undisputed Husband acquired 15 shares of voting common stock in PPI during the parties' marriage, and the 15 shares are properly considered Husband's separate property because they were gifted to Husband by his Mother. *See* section 452.330.2(1) and *Fike*, 509 S.W.3d at 802 (property a spouse acquires by gift subsequent to the marriage is considered to be his separate property).

However, the parties disagree as to whether the additional 135 shares of non-voting common stock Husband acquired during the marriage were issued as a stock split or stock dividend on the original 15 shares of voting stock gifted to Husband. Husband contends the additional 135 shares of non-voting stock were issued as a stock split, and therefore, should be properly classified as Husband's separate property. *See Hoffmann*, 676 S.W.2d at 822; *Bruske*, 656 S.W.2d at 295; section 452.330.2(2); *see also Davis*, 107 S.W.3d at 434; *Welch*, 821 S.W.2d

14

at 561; *Drikow*, 803 S.W.2d at 127. Husband further asserts the trial court erred in classifying the 135 shares of non-voting common stock in PPI as marital property and awarding Wife half of the value of the shares on the basis the shares were acquired as a result of a stock dividend. In contrast, Wife asserts the additional 135 shares of non-voting common stock were issued as a stock dividend, and therefore, the trial court properly classified the 135 shares as marital property and properly awarded her half of the value of those shares to Wife. *See Davis*, 107 S.W.3d at 434-35; *Welch*, 821 S.W.2d at 561; *Drikow*, 803 S.W.2d at 127.

Accordingly, in order to determine whether the trial court's classification of the 135 shares of non-voting stock in PPI as marital property on the basis the shares were acquired as a result of a stock dividend was erroneous, we must examine the differences between a stock dividend and stock split, which is an issue that has not been addressed by the parties and appears to be an issue of first impression in Missouri case law.

### a. The Determination as to Whether a Transaction is a Stock Dividend or Stock Split

"Classifying a transaction as a stock dividend or a stock split often proves difficult." Barbara Black, *Corporate Dividends and Stock Repurchases* section 5:23 (November 2018 Update).[6] A corporation's mere use of the word "dividend" or "stock split" in denominating the issuance of stock to shareholders should not be controlling in determining whether the transaction is a stock dividend or stock split because "what is denominated by a corporation as a stock dividend may in truth be a stock split and vice versa." 18 C.J.S. *Corporations* section 192 (June 2019 Update)[7] (citing *Anacomp, Inc. v. Wright*, 449 N.E.2d 610, 617 (Ind. App. 1983)); *see* 18B Am. Jur. 2d *Corporations* section 979 (May 2019 Update)[8] (similarly providing and

---

[6] All further references to Barbara Black, *Corporate Dividends and Stock Repurchases* section 5:23 are to the November 2018 Update.
[7] All further references to sections in 18 C.J.S. *Corporations* are to the June 2019 Update.
[8] All further references to sections in 18B Am. Jur. 2d *Corporations* are to the May 2019 Update.

citing *Anacomp, Inc.*, 449 N.E.2d at 617)); *see also Matter of Estate of Dawson*, 641 A.2d 1026, 1034 (N.J. 1994) (finding that "a corporation's mere use of the word 'dividend' should not be controlling" in determining whether a transaction is a stock dividend). Instead, courts look behind the corporation's denomination of the transaction to determine "the essence of the corporate transaction." *See* 18 C.J.S. *Corporations* sections 192 and 372 (citing *Anacomp*, 449 N.E.2d at 617).

Our Court's review of instructive legal authority reveals the most important factor that evinces "the essence of the corporate transaction" and distinguishes a stock split from a stock dividend is whether the transaction resulted in an increase in the stated capital of the corporation. *See, e.g.*, 25 Mo. Practice Series section 22.2 (2d ed.) (January 2019 Update)[9] ("A [stock] dividend affects the stated capital of the corporation. In contrast, a 'stock split' is simply the division of shares into a greater number without any change in the stated capital."); *see also* 18 C.J.S. *Corporations* sections 192 and 372 (similarly recognizing the distinction).

Missouri case law and statutes collectively recognize the aforementioned distinction between a stock dividend and stock split. *See Bruske*, 656 S.W.2d at 295 ("a stock split accomplishes no change in the amount of capital contribution to the corporation . . ."); section 351.220(3)-(5) RSMo Supp. 2002[10] (providing that if dividends are declared payable in its own shares, whether or not those dividends have a par value or are without a par value, "there shall be [an amount of surplus] transferred to stated capital"); 25 Mo. Practice Series section 22.8 (explaining section 351.220(3)-(5) sets forth "principles for accounting for [stock dividends and stock splits] in the capital accounts of the corporation" including that for stock dividends, amounts are to be transferred to stated capital from surplus, whereas "[a] split-up or division of

---

[9] All further references to sections in 25 Mo. Practice Series are to the 2d ed. January 2019 Update.
[10] Unless otherwise indicated, all further statutory references to section 351.220 are to RSMo Supp. 2002, which incorporates amendments through 2001 and is the latest version of the statute.

the issued shares of any class into a greater number of shares of the same class without increasing the stated capital of the corporation is not deemed to be a [stock] dividend"); *see also Hoffmann*, 676 S.W.2d at 827 (citing to a former version of 351.220 and indicating the statute applies to closely-held corporations such as PPI).

Furthermore, instructive authority, including authority from Missouri, indicates that whether the issuance of stock resulted in an increase in the stated capital of the corporation is the most important distinguishing factor in determining whether the transaction is properly classified as a stock split or stock dividend. As stated in Missouri Practice:

> [A] stock dividend involves no separation of assets, but a simple bookkeeping transfer from surplus to capital showing that the profits are being plowed back into the company . . .. *[T]he only real difference between a stock split and a [stock] dividend is the capitalization of surplus in the latter*[.]

4 Mo. Practice Series section 474.463 (2d ed.) (November 2018 Update)[11] (emphasis added and quotations omitted); *see also* 3 Treatise on the Law of Corporations section 20:21 (3d) (November 2018 Update)[12] (explaining "[c]apitalization of surplus refers to the accounting transfer from one of the surplus accounts to the capital stock (stated capital) account"). Similarly, American Jurisprudence provides:

> *The essential distinction* between a stock dividend and a stock split is that in the former there is a capitalization of earnings or profits, together with a distribution of the added shares which evidence the assets transferred to capital, while in the latter there is a mere increase in the number of shares that evidence ownership without an alteration of the amount of capital, surplus, or segregated earnings.

18B Am. Jur. 2d *Corporations* section 979 (emphasis added); *see also* 11 Fletcher Cyc. Corp. section 5362.10 (June 2019 Update)[13] ("[c]ourts have typically viewed the capitalization of

---

[11] All further references to 4 Mo. Practice Series section 474.463 are to the 2d ed. November 2018 Update.
[12] All further references to 3 Treatise on the Law of Corporations section 20:21 are to the 3d November 2018 Update.
[13] All further references to 11 Fletcher Cyc. Corp. section 5362.10 are to the June 2019 Update.

earnings or surplus *as the linchpin for distinguishing* between a [stock] split and [stock] dividend") (emphasis added).

Nevertheless, whether the issuance of stock resulted in an increase in the stated capital of the corporation is not conclusive as to whether the transaction is properly designated as a stock dividend or stock split. 11 Fletcher Cyc. Corp. section 5362.10. Accordingly, a court may consider other factors in determining whether a stock dividend or stock split occurred, including whether the transaction is expressed as a percentage or an exchange and the size of the share increase.[14], [15] *Compare Black's Law Dictionary* 493 (7th ed. 1999)[16] (defining a "stock dividend" as "[a] dividend paid in stock expressed as a percentage of the number of shares already held by a shareholder") *with Black's Law Dictionary* 1432 (defining a "stock split" in relevant part as "[t]he issuance of two or more new shares in exchange for each old share . . .");

---

[14] Another factor a court may generally consider in determining whether a stock dividend or stock split occurred is the effect of the distribution on the market price of the stock. 11 Fletcher Cyc. Corp. section 5362.10. However, this factor would not be applicable in this case, because PPI is a closely-held corporation, and therefore, there is no market price for PPI stock. *See* Robert D. Feder & Todd A. Zigrang, *Valuing Specific Assets Divorce* section 10.04 (2019-1 Supplement) and Elizabeth Pollman, *Line Drawing in Corporate Rights Determinations*, 65 DePaul L. Rev. 597, 630 (Winter 2016) (citing to the American Bar Association Committee on Corporate Laws) and Zenichi Shishido, *Conflicts of Interest and Fiduciary Duties in the Operation of a Joint Venture*, 39 Hastings L.J. 63, 68-69 (November 1987) (all providing there is no market price for stock in a closely-held corporation).

[15] In support of his argument that the transaction at issue in this case was a stock split, Husband relies on testimony providing Husband's proportionate ownership interests in PPI were not altered as a result of him receiving the 135 shares of non-voting common stock, attempting to argue, without citing to any legal authority, that this is a factor which always distinguishes a stock split from a stock dividend. It is true that when a shareholder receives shares as a result of a stock split, his proportionate ownership interest is not altered. *Bruske*, 656 S.W.2d at 295; *Black's Law Dictionary* 1432. However, the same may be true when a shareholder receives shares as a result of a stock dividend, under circumstances where *all* shareholders in the company receive shares as a result of the stock dividend, and therefore, all stockholders' proportionate ownership interests remain the same. *See generally* 18B Am. Jur. 2d *Corporations* section 987 ("[t]he stockholder, by reason of a stock dividend, secures no greater interest in the assets of the corporation than the stockholder had before"); Barbara Black, *Corporate Dividends and Stock Repurchases* section 5:23 (when a corporation distributes a stock dividend to its shareholder, "his proportionate interest in the corporation remains unchanged"). Accordingly, whether a shareholder's proportionate interests are altered as a result of the issuance of stock is not a factor which necessarily distinguishes a stock split from a stock dividend, and Husband's argument to the contrary has no merit. Furthermore, the following language in the December 15, 2006 PPI Consent, which states "[PPI] shall issue to the *shareholders* Nine (9) shares of its non-voting common stock, no par value, for each one (1) share of voting common stock, $1 par value," indicates *all* PPI shareholders, including Husband, received shares that did not alter their proportionate interests in the company. (emphasis added). Under these circumstances, the evidence that Husband's proportionate ownership interests in PPI were not altered as a result of the December 15, 2006 transaction is not a relevant factor in determining whether a stock split or stock dividend occurred.

[16] All further references to *Black's Law Dictionary* are to 7th ed. 1999.

18

11 Fletcher Cyc. Corp. section 5362.10 (providing that, *inter alia*, the issuing corporation's description of the transaction and the size of the share increase are factors to be considered); *see also* Barbara Black, *Corporate Dividends and Stock Repurchases* section 5:23 ("[s]tock dividends generally are characterized by only a small increase in the number of outstanding shares").

We now examine whether, based on the aforementioned instructive precedent, the trial court's finding that the 135 shares of non-voting common stock were acquired due to the issuance of a stock dividend and the court's resulting classification of the shares as marital property is erroneous and constitutes reversible error.

### b. Whether the Portion of the Trial Court's Judgment at Issue in this Point on Appeal is Erroneous and Constitutes Reversible Error

For the reasons discussed below, we find the portion of the trial court's judgment pertaining to the classification of the 135 shares of non-voting common stock in PPI as marital property, (i) is not supported by substantial evidence and misapplies the law; (ii) is against the weight of the evidence; and (iii) constitutes an abuse of discretion, is prejudicial, and requires reversal, with additional evidence to be adduced on remand.

### i. The trial court's judgment is not supported by substantial evidence and misapplies the law

First, we hold the trial court's judgment at issue in this point on appeal is not supported by substantial evidence and misapplies the law. Relying solely on the PPI Consent's mere usage of the word "dividend," the trial court's judgment found the 135 shares of non-voting common stock in PPI were acquired as a stock dividend, and as a result, the trial court classified the shares as marital property and awarded Wife a cash payment of $736,695 for what the court found to be her portion of the value of these shares. As stated previously, a corporation's mere use of the word "dividend" or "stock split" in denominating the issuance of stock to shareholders is not

19

controlling in determining whether the transaction is a stock dividend or stock split. *See* 18

C.J.S. *Corporations* section 192; 18B Am. Jur. 2d *Corporations* section 979; *see also Dawson*,

641 A.2d at 1034. Consequently, the fact the PPI Consent merely uses the word "dividend" does

not have probative force upon the proposition that the 135 shares of non-voting common stock

were acquired as a stock dividend and does not constitute substantial evidence from which the

trial court could have reasonably decided such a proposition is true. *See Day*, 528 S.W.3d at

411.

Therefore, the trial court's finding that the 135 shares of non-voting common stock in PPI

were acquired due to the issuance of a stock dividend solely based upon the mere usage of the

word "dividend" in the PPI Consent, and the trial court's resulting classification of the shares as

marital property, are not supported by substantial evidence and constitute a misapplication of the

law. *See id.*; *see also Selby v. Selby*, 149 S.W.3d 472, 492 (Mo. App. W.D. 2004) and *Meservey*

*v. Meservey*, 841 S.W.2d 240, 246 (Mo. App. W.D. 1992) (finding the trial court's classification

of property was a misapplication of law when the evidence did not support its decision).

### ii. The trial court's judgment is against the weight of the evidence

We also hold the trial court's finding that the 135 shares of non-voting common stock in

PPI were acquired due to the issuance of a stock dividend and the court's resulting classification

of the shares as marital property are against the weight of the evidence because the court could

not have reasonably found, from the record at trial, the existence of a fact that is necessary to

sustain the judgment. *See Day*, 528 S.W.3d at 412. From this Court's review of the voluminous

record, it appears there is no evidence of the most important distinguishing factor in determining

whether the issuance of the 135 shares of non-voting common stock was a stock split or stock

dividend, i.e., whether the transaction resulted in an increase in the stated capital of PPI. *See* 4

20

Mo. Practice Series section 474.463; 18B Am. Jur. 2d *Corporations* section 979; *see also* 11

Fletcher Cyc. Corp. section 5362.10; 3 Treatise on the Law of Corporations section 20:21.

Furthermore, the only evidence in the record regarding the other two factors relevant in

determining whether a stock dividend or stock split occurred support a finding that the issuance

of the 135 shares of non-voting common stock in PPI was a stock split. *See Day*, 528 S.W.3d at

412 (when reviewing an against-the-weight-of-the-evidence challenge "we can consider

evidence contrary to the trial court's judgment that is not based on a credibility determination").

First, the PPI Consent expresses the transaction as an exchange rather than as a percentage:

"[PPI] shall issue to the shareholders Nine (9) shares of its non-voting common stock, no par

value, *for each* one (1) share of voting common stock, $1 par value.[17] (emphasis added).

*Compare Black's Law Dictionary* 1432 (defining a "stock split" in relevant part as "[t]he

issuance of two or more new shares in exchange *for each* old share . . .") (emphasis added) *with*

*Black's Law Dictionary* 493 (defining a "stock dividend" as "[a] dividend paid in stock

expressed as a percentage of the number of shares already held by a shareholder"). Accordingly,

this factor supports a finding that the issuance of the 135 shares of non-voting common stock

was a stock split. *Id*.

_____

[17] As a result of the PPI Consent being executed, Husband was the owner of 15 shares of voting common stock and 135 shares of non-voting common stock, or a total of 150 shares, indicating that if a stock split in fact took place on the 15 shares originally owned by Husband, it was a 10-for-1 split rather than a 9-for-1 split. Wife asserts that because Husband was the owner of 15 shares of voting common stock before and after the execution of the PPI Consent, an exchange and stock split did not occur as a matter of law. We disagree. There is evidence in the record from which a trial court could find on remand that, (1) an exchange occurred by Husband's receipt of an additional certificate reflecting added shares owned; and (2) a stock split took place where in exchange for every one share of voting common stock owned by Husband, he received one share of voting common stock and nine shares of non-voting common stock. *See Bruske*, 656 S.W.2d at 295 ("[w]hether by a surrender of the certificate evidencing the original number of shares for a certificate in the new amount of shares, or *by receipt of an additional certificate reflecting added shares owned, the transaction is an exchange of one number of shares for another*") (emphasis added); *McCormick v. Frisch*, 85 A.2d 793, 794-95 (Md. 1952) (finding a distribution of stock was a stock split rather than a stock dividend where, *inter alia*, "[a]ny holder of one share of [voting] common stock received one share of [voting] common stock and three shares of non-voting common stock"). However, as indicated below, the evidence in the record before us is not necessarily dispositive as to the issue of whether a stock dividend or stock split occurred, and the trial court must make this determination on remand after considering additional evidence regarding whether the issuance of the 135 shares of non-voting common stock resulted in an increase in the stated capital of PPI.

21

An additional factor supporting a finding that the issuance of the 135 shares of non-voting common stock in PPI was a stock split is there was a large increase in the number of outstanding shares owned by Husband; specifically, while Husband only owned a total of 15 shares of PPI stock before the transaction, he owned a total of 150 shares of PPI stock after the transaction. *See* 11 Fletcher Cyc. Corp. section 5362.10 (one factor a court may consider in determining whether a transaction is a stock split or stock dividend is the size of the share increase); *cf.* Barbara Black *Corporate Dividends and Stock Repurchases* section 5:23 ("[s]tock dividends generally are characterized by only a small increase in the number of outstanding shares").

In sum, based on the record before us, the trial court's finding that the 135 shares of non-voting common stock in PPI were acquired due to the issuance of a stock dividend and the trial court's resulting classification of the shares as marital property are against the weight of the evidence because the court could not have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. *Day*, 528 S.W.3d at 412.

### iii. The trial court's judgment constitutes an abuse of discretion, is prejudicial, and requires reversal, with additional evidence to be adduced on remand

The portion of the trial court's judgment at issue in this point constitutes an abuse of discretion because it is not supported by substantial evidence, it misapplies the law, and it is against the weight of the evidence. *See generally Landewee*, 515 S.W.3d at 694; *Murphy*, 536 S.W.2d at 32; *Cule*, 457 S.W.3d at 864-65; *Torrey*, 333 S.W.3d at 36. However, a court's erroneous classification of property is prejudicial and requires reversal only if the error materially affects the distribution of property. *Herschend v. Herschend*, 486 S.W.3d 346, 355-56 (Mo. App. S.D. 2015) (citing *Appling v. Appling*, 156 S.W.3d 454, 458 (Mo. App. E.D. 2005)); *Sonderman v. Sonderman*, 46 S.W.3d 115, 117 (Mo. App. E.D. 2001).

22

In this case, as a result of the erroneous classification of the 135 shares of non-voting stock in PPI as marital property, the trial court awarded Wife a cash payment of $736,695 for half of the value of the shares, which is a substantial and material amount of money. Under these circumstances, we find the trial court's erroneous classification of property materially affects the distribution of property, is prejudicial, and requires reversal. *See Herschend*, 486 S.W.3d at 354-56, 357 (similarly finding under circumstances where the trial court's erroneous classification resulted in the court awarding the husband property with a value of approximately one million dollars); *cf. Sonderman*, 46 S.W.3d at 116-17 (finding an erroneous classification of property valued at approximately $5,000 did not warrant reversal under circumstances where, *inter alia*, the value was "relative[ly] insignificant . . . as compared to the entire marital estate"); *see also Appling*, 156 S.W.3d at 458.

On remand, we instruct the trial court to direct the parties to adduce evidence as to whether the issuance of the 135 shares of non-voting common stock affected the stated capital in PPI, and in accordance with the law set forth in this opinion, determine whether the 135 shares of stock were issued as a stock dividend (and, therefore, are properly classified as marital property) or if the 135 shares of stock were issued as a stock split (and therefore, are properly classified as Husband's separate property). *See Selby*, 149 S.W.3d at 475-92 (similarly "remand[ing] for the trial court to adduce additional evidence" on factual issues relevant to the classification of property as marital or separate); *see also Hoffmann*, 676 S.W.2d at 822; *Davis*, 107 S.W.3d at 434-35; *Welch*, 821 S.W.2d at 561; *Drikow*, 803 S.W.2d at 127; *Bruske*, 656 S.W.2d at 295; section 452.330.2(2). The trial court should then divide the marital property in a just and equitable manner, as the court finds reasonable under the evidence. *See Schutter v. Seibold*, 540 S.W.3d 494, 501 (Mo. App. W.D. 2018); *Selby*, 149 S.W.3d at 492.

23

### 4. Conclusion as to Husband's First Point on Appeal

Based on the foregoing, Husband's first point on appeal is granted in part and denied in part. Husband's first point is granted to the extent he claims the trial court abused its discretion in classifying 135 shares of non-voting common stock in PPI as marital property and awarding Wife half of the value of the shares on the basis the shares were acquired as a result of a stock dividend. Husband's first point is denied to the extent he argues the 135 shares should be deemed a stock split and classified as his separate property at this point in the proceedings.

### B. Whether the Trial Court Abused its Discretion in Classifying Portions of the Retained Earnings of PPI and SIA as Marital Property and Awarding Wife Half of the Value of the Portions of Retained Earnings in Each Company

In Husband's second and third points on appeal, he asserts the trial court abused its discretion in classifying portions of the retained earnings of PPI and SIA as marital property and awarding Wife half of the value of the portions of the retained earnings in each company. For the reasons discussed below, we disagree.

### 1. Relevant Facts

During the pendency of the dissolution proceedings, Husband was the President, Secretary, and a member of the Board of Directors of both PPI and SIA. During that same timeframe, Husband's trusts owned 50% of PPI stock and 50% of SIA stock; Brother's trusts owned the other 50% of PPI and SIA stock. Because Husband is the trustee of his trusts and his Brother's trusts, he has the authority to vote 100% of the shares of PPI and SIA stock, and he has a fiduciary duty to the beneficiaries of the trusts.

In addition, Husband receives shareholder income from PPI and SIA. PPI and SIA did not distribute all of Husband's shareholder income for several years, including from 2013-2015 (the timeframe between when Wife filed her petition for dissolution of marriage and when the

24

bench trial began, i.e., the pendency of the dissolution proceedings).  As a result, PPI and SIA had a significant amount of retained earnings during those years.

The testimony of Wayne Bircher, the CPA for PPI and SIA, demonstrates that Husband, in his role as President of PPI and in his role of President of SIA, had the sole authority to order both companies' retained earnings to be distributed to the shareholders of PPI and SIA during the pendency of the dissolution proceedings.

### 2. Relevant Parts of the Trial Court's Judgment Relating to Portions of Retained Earnings of PPI and SIA

In determining Husband's annual income for purposes of his monthly child support and maintenance obligations, the trial court considered, *inter alia*, portions of retained earnings from both PPI and SIA.  On appeal, Husband does not challenge the trial court's determination of Husband's annual income, the court's consideration of portions of Husband's retained earnings from PPI and SIA in determining his annual income, or the court's orders relating to child support and maintenance.

The trial court also considered portions of retained earnings from PPI and SIA in connection with the division of property.  In making this decision, the trial court acknowledged the fiduciary duties Husband, in his role of trustee of his trusts and his Brother's trusts, owed to the beneficiaries of the trusts.  The trial court also noted that due to Husband's management role, he owed additional fiduciary duties to the beneficiaries of his Brother's trusts to grow and maintain the companies to the best of Husband's ability.  Further, the trial court recognized that, (1) the exercise of Husband's substantial control over decisions to distribute the corporate earnings for PPI and SIA could have the effect of depriving Wife of her share of marital income; and (2) "Husband ha[d] incentives to keep retained earnings on the company books, in order to possibly shield this income from the [c]ourt's consideration as part of his dissolution proceedings."

25

After balancing Husband's fiduciary's duties with respect to his Brother's trusts versus the impact of Husband's substantial control over the retained earnings of the companies upon Wife and the dissolution proceeding, the trial court found only portions of retained earnings from PPI and SIA during the pendency of the dissolution proceedings (from 2013-2015) were marital property, even though Wife had also requested the trial court to classify the retained earnings from many more years as marital property. With respect to PPI, the trial court ordered Wife to receive a total of $172,273 by way of a cash equalization payment from Husband. And with respect to SIA, the trial court ordered Wife to receive a total of $459,513 by way of a cash equalization payment from Husband. On appeal, neither party challenges the trial court's calculations underlying either cash equalization payment; instead, Husband only argues on appeal that the trial court erred in classifying the portions of retained earnings of PPI and SIA as marital property and awarding Wife half of the value of the portions of the retained earnings in each company.

### 3. Husband's Second Point on Appeal

In Husband's second point on appeal, Husband claims the trial court's classification of the portions of retained earnings of PPI and SIA as marital property constitutes an abuse of discretion because, (1) the extent of his control over the companies was limited by his fiduciary duties; and (2) the trial court's decision is inconsistent with the business judgment rule.

### a. Relevant Law

"Retained earnings" of a corporation are "net income which would be available for distribution as dividends, for payment of wages, salaries and bonuses, and other proper corporate purposes." *Ramon v. Ramon*, 963 A.2d 128, 133 (Del. 2008) (quotations omitted). In Missouri, retained earnings of a corporation generally do not constitute marital property, because the earnings and profits of a company remain its property until separated from other corporate assets

26

and distributed as, *inter alia*, dividends. *Hoffmann*, 676 S.W.2d at 827; *see also Short v. Short*, 356 S.W.3d 235, 244 (Mo. App. E.D. 2011); *Craig-Garner v. Garner*, 77 S.W.3d 34, 38 (Mo. App. E.D. 2002); *Ramon*, 963 A.2d at 133. Moreover, "only [ ] directors [are] empowered to declare a dividend[,]" unless "[the] directors of [a] closely[-]held corporation relinquished their authority over declaration of dividends to the president." *Hoffmann*, 676 S.W.2d at 827, 827 n.8 (citing section 351.220 RSMo 1978 and *Brown v. Luce Mfg. Co.*, 96 S.W.2d 1098, 1102 (Mo. App. 1936)); *see* section 351.220.

In *Hoffmann*, the wife argued on appeal that the trial court erred in finding the retained earnings of a closely-held corporation in which the husband was a stockholder and member of the board of directors did not constitute marital property. 676 S.W.2d at 826-27. This case, decided by the Missouri Supreme Court in 1984, was the first Missouri case explicitly "address[ing] the issue of whether retained earnings in a closely[-]held corporation constitute marital property." *Id.* at 827. The Supreme Court noted: "Other jurisdictions which have considered the issue cite the critical distinguishing factors as being [(1)] a controlling interest in the corporation by the owner spouse and [(2)] [the owner spouse's] substantial control over decisions to distribute corporate earnings." *Id.* (citing *J.D.P. v. F.J.H.*, 399 A.2d 207 (Del. 1979); *Mifflin v. Mifflin*, 556 P.2d 854 (Idaho 1976) (superseded by statute on other grounds); *Simplot v. Simplot*, 526 P.2d 844 (Idaho 1974); *Speer v. Quinlan, In and For Lewis County*, 525 P.2d 314 (Idaho 1973)). The *Hoffmann* Court then applied those two "critical distinguishing factors" to the circumstances of the case. 676 S.W.2d at 827.

As to the first factor, the Missouri Supreme Court held the husband did not have a controlling interest in the corporation because "[he] only owned 29.5 percent of the outstanding corporate stock and was not a controlling shareholder." *Id.* As to the second factor, the Court held the husband did not have substantial control over decisions to distribute corporate earnings

27

because "as only one of four board members, he could not unilaterally declare or withhold dividends"; and there was "[an] absence of evidence of collusion with other board members to defraud petitioner of marital property by minimizing dividends[.]" *Id.* Under those circumstances, the Supreme Court affirmed the trial court's finding that the retained earnings of the closely-held corporation did not constitute marital property. *Id.* at 826-27.

As aptly stated by this Court:

> [T]he teaching of *Hoffmann* [is] that there are circumstances where corporate retained earnings may be treated as marital property. As noted by the [C]ourt in *Hoffmann*, whether retained earnings are considered marital property is often determined by evidence of a controlling interest in the corporation by the owner spouse and the owner spouse's substantial control over decisions to distribute corporate earnings.

*Garner*, 77 S.W.3d at 38 n.4 (citing *Hoffmann*, 676 S.W.2d at 827).

One of the cases cited within *Hoffmann*, the Delaware Supreme Court case of *J.D.P. v. F.J.H.*, explains why evidence of a controlling interest in the corporation by the owner spouse and/or evidence of the owner spouse's substantial control over decisions to distribute corporate earnings are, as *Hoffmann* described, "critical" factors in determining whether retained earnings may be treated as marital property:

> [I]f one spouse controls the corporation, that spouse 'would have the power to determine whether earnings are to be retained and thus insulated from all legal and equitable claims of the other spouse. . . . [C]ertainly a [dissolution] statute which commands a [c]ourt to 'equitably divide' property between spouses is not intended to give that sort of unilateral control to one of them.'

*Ramon*, 963 A.2d at 133, 133 n.16, 17 (quoting *J.D.P. v. F.J.H*, 399 A.2d at 210). Of course, like the Delaware dissolution statute referred to in *J.D.P. v. F.J.H.*, Missouri's dissolution statute, section 452.330.1, "requires a fair and equitable distribution of property." *See Fike*, 509 S.W.3d at 795 (citing, *inter alia*, section 452.330.1); *see also Ramon*, 963 A.2d at 133, 133 n. 17 (citing *J.D.P. v. F.J.H*, 399 A.2d at 210).

### b. Analysis

#### i. The two factors discussed in *Hoffmann*

Before we turn to Husband's specific arguments on appeal, we initially consider the two factors discussed in *Hoffmann*. The first factor, whether Husband had a controlling interest in PPI or SIA, favors Husband's position on appeal under the circumstances of this case. Husband's trusts owned 50% of the stock in PPI and SIA during the pendency of the dissolution proceedings, and his Brother's trusts owned the remaining 50% of the stock in each company. Because Husband was the trustee of his trusts and his Brother's trusts, he had the authority to vote 100% of the shares of PPI and SIA stock. Additionally, Husband had a fiduciary duty to the beneficiaries of the trusts to act in their best interests when Husband voted shares of PPI and SIA stock owned by the trusts. *See* section 456.8-802.7 RSMo Supp. 2009[18] and *Betty G. Weldon Revocable Trust ex rel. Vivion v. Weldon ex rel. Weldon*, 231 S.W.3d 158, 169 n.5., 171-72 (Mo. App. W.D. 2007) ("[i]n voting shares of stock . . . the trustee shall act in the best interests of the beneficiaries") (quoting section 456.8-802.7 RSMo Supp. 2006). Although there may be circumstances where a trial court could find a party violated his fiduciary duties to the beneficiaries of the trust when voting shares of stock in order to advance his own personal interests in a divorce proceeding, thereby effectively exercising a "controlling interest" in a company, the trial court made no such findings here. Accordingly, we turn to the second factor discussed in *Hoffmann*.

The second factor discussed in *Hoffmann* supports the trial court's decision classifying portions of the retained earnings of PPI as marital property, because the undisputed evidence is that Husband, in his role as President of both companies, had substantial control over decisions to distribute the retained earnings of both companies during the pendency of the dissolution

---

[18] Unless otherwise indicated, all references to section 456.8-802.7 are to RSMo Supp. 2009, which incorporates amendments through 2008 and is the latest version of the statute.

proceedings. Specifically, CPA Wayne Bircher's testimony demonstrates that Husband, in his role as President of PPI and in his role of President of SIA, had the sole authority to order both companies' retained earnings to be distributed to the shareholders of the companies (including Husband, who was a 50% shareholder of each company). An inference from Bircher's testimony is that the directors of PPI and SIA, both closely-held corporations, relinquished their authority over declaration of dividends to Husband in his role as the President of both companies. *See Hoffmann*, 676 S.W.2d at 827 n.8 (citing *Brown*, 96 S.W.2d at 1102) (indicating such a relinquishment of authority is permitted in a closely-held corporation).

Because the trial court could have reasonably found from the evidence and inferences that Husband could unilaterally declare and withhold dividends for PPI and SIA, the trial court's finding that Husband had substantial control over the decisions to distribute the retained earnings of both companies during the pendency of the dissolution proceedings is supported by the evidence. *See Day*, 528 S.W.3d at 411. In addition, the evidence of Husband's authority to unilaterally declare and withhold dividends distinguishes the circumstances of this case from those in *Hoffmann*, where the Missouri Supreme Court explicitly found the husband had no such authority. *See* 676 S.W.2d at 827. Finally, because there was sufficient evidence Husband had substantial control over decisions to distribute corporate earnings of PPI and SIA, one of the two "critical" factors under *Hoffmann*, we cannot find the trial court's classification of the portions of retained earnings of PPI and SIA as marital property constitutes an abuse of discretion. *See id.*; *Garner*, 77 S.W.3d at 38 n.4; *see also Landewee*, 515 S.W.3d at 694; *Cule*, 457 S.W.3d at 864-65; *Torrey*, 333 S.W.3d at 36; *Ramon*, 963 A.2d at 132-35 (affirming trial court's decision by finding portion of retained earnings account was marital property where the "[h]usband had the power to control the disposition of the funds"); *In re Marriage of Schmitt*, 909 N.E.2d 221, 230 (Ill. App. Ct. 2009) (". . . retained earnings in subchapter S corporations . . . are considered

30

marital if the spouse has control over the decision to disburse the retained earnings"); *cf. In re Marriage of Casten*, 2012 WL 1860358, at *4 (Iowa Ct. App. 2012) ("retained earnings of a corporation are nonmarital property *unless* the [spouse] has sufficient control of the corporation to be able to cause the earnings to be retained") (emphasis added) (citing *Swope v. Swope*, 834 P.2d 298, 303 (Idaho 1992)).

We now turn to Husband's specific arguments in his second point on appeal.

### ii. Husband's argument that the extent of his control was limited by his fiduciary duties

Husband initially argues the trial court's classification of the portions of retained earnings of PPI and SIA as marital property was an abuse of discretion because the extent of his control over the retained earnings of PPI and SIA during the pendency of the dissolution proceedings was limited by his fiduciary duties to the beneficiaries of his trusts and his Brother's trusts.

As previously indicated, we recognize that Husband, in his role as trustee of his trusts and his Brother's trusts, owed a fiduciary duty to the beneficiaries of the trusts to act in their best interests when Husband voted shares of PPI and SIA stock owned by the trusts. *See* section 456.8-802.7; *Weldon*, 231 S.W.3d at 169 n.5., 171-72. It is equally true that Husband, in his role as President, Secretary, and a member of the Board of Directors of PPI and SIA, owed a fiduciary duty to the beneficiaries of his trusts and his Brother's trusts to, *inter alia*, "act with fidelity and subordinate [his] personal interest to the interest of the [companies] should there be a conflict" and "to exercise the utmost good faith in the discharge of [his] duties." *See Waters v. G & B Feeds, Inc.*, 306 S.W.3d 138, 146 (Mo. App. S.D. 2010) (quoting, *inter alia*, *Johnson v. Duensing*, 351 S.W.2d 27, 32 (Mo. banc 1961)).

Importantly, the trial court's judgment demonstrates the court considered Husband's fiduciary duties relating to trust and business organization law in completing its required task in

31

the instant dissolution proceeding:  to make a fair and equitable distribution of property and ensure Husband was not permitted to use his substantial control over decisions to distribute corporate earnings of PPI and SIA to insulate himself from Wife's claim to portions of the retained earnings.  *See id*.; *Fike*, 509 S.W.3d at 795; section 452.330.1; section 456.8-802.7; *Weldon*, 231 S.W.3d at 171-72; *Ramon*, 963 A.2d at 133, 133 n.16, 17; *J.D.P. v. F.J.H*, 399 A.2d at 210.  In balancing these competing interests and concerns, the trial court found that only portions of the retained earnings of PPI and SIA during the pendency of the dissolution proceedings (from 2013-2015) were marital property, even though Wife had requested the trial court to classify the retained earnings from many more years as marital property.  Based on the foregoing, we cannot find the trial court's decision is "clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to indicate indifference and a lack of careful judicial consideration," i.e., we cannot find the trial court's ruling constitutes an abuse of discretion.  *Torrey*, 333 S.W.3d at 36.

### iii.      Husband's argument that the trial court's decision is inconsistent with the business judgment rule

We now turn to Husband's argument that the trial court's classification of portions of the retained earnings of PPI and SIA as marital property is inconsistent with the business judgment rule, because his involvement in the decisions to hold back retained earnings were made in his role as a director and officer of the companies.  As recently stated by this Court:

> The business judgment rule protects the directors and officers of a corporation from liability for *intra vires* decisions within their authority and made in good faith, uninfluenced by any consideration other than an honest belief that the action promotes the corporation's best interest.  The rule vests the directors and shareholders with wide latitude in making judgments that affect the running of the corporation.  The rule precludes courts from interfering with the decisions of corporate officers and directors absent a showing of fraud, illegal conduct, an *ultra vires* act, or an irrational business judgment.

32

*Virgil Kirchoff Revocable Trust Dated 06/19/2009 v. Moto, Inc.*, 482 S.W.3d 834, 841-42 (Mo. App. E.D. 2016) (emphasis in original) (citations and quotations omitted).

The business judgment rule only protects a director or officer in making decisions in which he is, *inter alia*, "disinterested." *See* 3A Fletcher Cyc. Corp. section 1040 (April 2019 Update)[19] ("[t]o gain the protection of the business judgment rule, a director must have been disinterested, independent, and informed"); *see also Moto, Inc.*, 482 S.W.3d at 841-42 ("[t]he business judgment rule protects the directors and officers of a corporation from liability for *intra vires* decisions [in which they are, among other things,] uninfluenced by any consideration other than an honest belief that the action promotes the corporation's best interest") (emphasis in original); *Feldmeier v Feldmeier Equipment, Inc.*, 84 N.Y.S.3d 609, 614 (N.Y. App. Div. 2018) (finding the business judgment rule applies to decisions made by officers or directors exercising "unbiased judgment"). In this case, Husband was not disinterested in making decisions to hold back and not distribute retained earnings of PPI and SIA during the pendency of the dissolution proceedings because, due to the impending divorce and contested division of property, he had "a financial or pecuniary interest in a transaction other than that which devolves to the corporation[s] or to all of the shareholders generally." *See* 3A Fletcher Cyc. Corp. section 1040 (finding a director is "interested" under similar circumstances). In fact, the trial court's judgment explicitly found "Husband ha[d] incentives to keep retained earnings on the company books, in order to possibly shield this income from the [c]ourt's consideration as part of his dissolution proceedings."

Based on the foregoing, we hold the trial court did not err in finding Husband was not entitled to use the business judgment rule as a shield to insulate himself from Wife's claim to portions of the retained earnings of PPI and SIA during the pendency of the dissolution

---

[19] All further references to 3A Fletcher Cyc. Corp. section 1040 are to the April 2019 Update.

proceedings. *See generally Ramon*, 963 A.2d at 133, 133 n.16, 17; *J.D.P. v. F.J.H*, 399 A.2d at 210. Our holding is consistent with the fact Husband fails to cite, and this Court cannot find, any Missouri case applying the business judgment rule in a dissolution of marriage proceeding.[20]

### c. Conclusion as to Husband's Second Point on Appeal

Husband's second point on appeal is denied.

### 4. Husband's Third Point on Appeal

In Husband's third point on appeal, he contends the trial court's classification of the portions of retained earnings of PPI and SIA as marital property constitutes an abuse of discretion because it was improper for the trial court to consider the portions of the retained earnings of PPI and SIA as both marital property to be divided and as part of Husband's income for purposes of determining his child support and maintenance obligations.

Husband only relies on one case to support his argument: *Balven v. Balven*, 734 S.W.2d 909 (Mo. App. E.D. 1987). In *Balven*, the husband received an early retirement bonus in which

---

[20] This Court's extensive review of Missouri case law has revealed the business judgment rule has only been applied in cases involving the subject of business organizations which, (1) are brought by and/or against shareholders, employees, owners, companies, and/or companies' officials or board of directors; and (2) contain claims relating to a final accounting of a company, shareholder oppression, the authority of a board of directors to make certain decisions, breach of fiduciary duty, shareholder derivative actions, stockholders' ratification of board of directors' actions, waste of corporate assets, and conspiracy. *See Leggett v. Missouri State Life Ins. Co.*, 342 S.W.2d 833, 848-49, 887, 911, 918 (Mo. banc 1961) (claims arising from petition seeking final accounting of company brought by former stockholders); *Moto, Inc.*, 482 S.W.3d at 836-37, 841-42 (shareholder oppression claim against company and board of directors); *Ironite Products Co., Inc. v. Samuels*, 17 S.W.3d 566, 569, 572-73 (Mo. App. E.D. 2000) and *Ironite Products Co., Inc. v. Samuels*, 985 S.W.2d 858, 861-63 (Mo. App. E.D. 1998) (declaratory judgment claim brought by companies regarding board of directors' authority to relocate employee); *McLeese v. J.C. Nichols Co.*, 842 S.W.2d 115, 116-19 (Mo. App. W.D. 1992) (shareholder derivative action alleging breach of fiduciary duty claim against company and company's president and chairman of the board); *Delahoussaye v. Newhard*, 785 S.W.2d 609, 609-10, 613 (Mo. App. E.D. 1990) (shareholder derivative claim against directors); *Herbik v. Rand*, 732 S.W.2d 232, 233-35 (Mo. App. E.D. 1987) (shareholder oppression claim against company); *Neidert v. Neidert*, 637 S.W.2d 296, 298-99, 301 (Mo. App. S.D. 1982) (cross-claim for payment for services rendered to the company brought by director and president against company which related to the board of directors' decision); *Broski v. Jones*, 614 S.W.2d 300, 301-04 (Mo. App. W.D. 1981) (claims relating to payouts for salaries and bonuses brought by shareholder against company's president and company's secretary and general manager); *Jackson v. St. Regis Apartments, Inc.*, 565 S.W.2d 178, 180-84 (Mo. App. 1978) (shareholder oppression claim against company); *see also Robinson v. Lagenbach*, 439 S.W.3d 853, 854-56, 860-61 (Mo. App. E.D. 2014) (discussing applicability of business-judgment rule to action involving breach of fiduciary duty and shareholder oppression claims brought by shareholder against officers, directors, and company); *Sutherland v. Sutherland*, 348 S.W.3d 84, 88-91 (Mo. App. W.D. 2011) (business judgment rule instruction was proper in derivative action involving breach of fiduciary duty, waste of corporate assets, and conspiracy claims brought by owner of membership interest in LLC against other owners of membership interests, managing members, employee, and LLC).

husband would receive $400.00 a month for 48 months ("bonus"). *Id*. at 911, 912. In the husband and the wife's dissolution proceeding, the trial court classified the bonus as a marital asset for purposes of the division of property, but the court did not consider the bonus as a portion of the husband's income for purposes of determining maintenance. *Id*. at 911-13.

On appeal, the husband challenged the trial court's division of property. *Id*. at 911. In deciding the husband's claim, our Court noted that, *inter alia*: "[O]nce the [trial] court determined that the $400 [bonus] was to be treated as an asset the court was committed not to consider it as a basis for determining the award of maintenance, if any. Neither husband nor wife were entitled to a double benefit." *Id*. at 912-13.

Husband relies on the preceding language to argue that it was erroneous for the trial court to consider the portions of the retained earnings of PPI and SIA as both marital property to be divided and as part of Husband's income for purposes of determining his child support and maintenance obligations. However, "*Balven* is unlike the instant case in that the above-quoted passage from *Balven* pertains to a retirement bonus payable over 48 months," rather than to the foreseeably permanent portion of the retained earnings from PPI and SIA Husband was entitled to receive as a shareholder of both companies. *See In re Marriage of Medlock*, 749 S.W.2d 437, 443-44 (Mo. App. S.D. 1988) (similarly distinguishing *Balven* where a spouse's income stream was permanent). Under these circumstances, Husband's reliance on *Balven* is misplaced.

Moreover, we find the trial court's consideration of the portions of the retained earnings of PPI and SIA as both marital property to be divided and as part of Husband's income for purposes of determining his child support and maintenance obligations was not erroneous pursuant to the following reasoning:

> Income earned by a spouse is marital property up to the date of dissolution. The fact that the amount of [a] [h]usband's yearly income was considered in determining his child support and/or maintenance obligation has no bearing on

35

the classification of income acquired prior to the date of legal separation or dissolution as marital property.

*Livingston v. Livingston*, 58 S.W.3d 687, 689 (Mo. App. W.D. 2001) (quotations and citations omitted). We find this reasoning equally applies where, as here, the division of property and determination of a spouse's income for purposes of calculating his child support and maintenance obligations involve the consideration of assets and income based on portions of retained earnings held by closely-held corporations. Furthermore, "the majority view [ ] permits consideration of a marital asset as a source of income in determining [maintenance] or [child] support." 14 No. 5 Equitable Distribution Journal 49, 49, 53-54 (May 1997).

Based on the foregoing, Husband has failed to demonstrate the trial court abused its discretion or otherwise erred in considering portions of the retained earnings of PPI and SIA as both marital property to be divided and as part of Husband's income for purposes of determining his child support and maintenance obligations. Point three is denied.

**C.     Whether the Trial Court Abused its Discretion in Classifying Business Bank Account x7520 as Marital Property and Awarding Wife Half of the Value of the Account**

In Husband's fourth and final point on appeal, he contends the trial court abused its discretion in classifying Business Bank Account x7520 ("the Account") as marital property and awarding Wife half of the value of the Account.

**1.     Relevant Facts**

The Account was opened during the parties' marriage, in 2007.[21] Husband's Fourth Amended Statement of Property filed on December 30, 2016 provides the value of the Account

---

[21] The Account was originally opened in Husband's individual name, but in April 2013 (a few months before Wife filed her petition for dissolution of marriage), Husband changed the name on the Account to the name of his living trust. The trial court found this action was "an attempt [on the part of Husband] to remove a marital asset out of the marital estate by changing its name, to the prejudice of Wife." Husband does not challenge this finding on appeal, nor does he argue the Account is separate property because it was in the name of his living trust as of the time of the trial. Accordingly, it is unnecessary for our Court to address these issues in the instant case.

is approximately $410,360, and there was no specific evidence presented at trial as to the source of the $410,360.[22]

Based on the evidence adduced at trial, the trial court's judgment found that since the inception of the Account in 2007 until the time of trial, Husband used funds in the Account for PPI's business expenses. In addition, the trial court's judgment: valued the Account at $410,360; found the Account was marital property subject to division by the court; awarded the Account to Husband; and awarded Wife half of the value of the Account ($205,180) by way of a cash equalization payment.

### 2. Analysis of Husband's Argument on Appeal

On appeal, Husband argues the trial court erred in classifying the Account as marital property and awarding Wife half of the value of the Account because "there was no evidence of the character of the funds in the [A]ccount to support a finding that the funds were marital, and the court found that the [A]ccount was used for [PPI's business expenses]." For the reasons discussed below, we find this argument lacks merit.

In this case, the Account, which was originally opened in Husband's individual name and later changed to be in the name of Husband's living trust, is presumed to be marital property under section 452.330.3 because it was opened during the parties' marriage. *See Kauffman v. Kauffman*, 101 S.W.3d 35, 45 (Mo. App. W.D. 2003) (similarly finding); *see also* section 452.330.3; *McQueen*, 507 S.W.3d at 151. It was Husband's burden to overcome this presumption of marital property and demonstrate by clear and convincing evidence that the Account falls under one of the exceptions set out in section 452.330.2. *See McQueen*, 507 S.W.3d at 151. Because Husband failed to meet this burden and did not present any specific

---

[22] From this Court's review of the voluminous record, Husband only offered vague testimony that, (1) "with respect to [ ] S Corporation pass-through [income], [ ] [PPI] provided to his trust a quarterly distribution"; and (2) he would deposit checks reflecting the distributions into the Account. In his briefs, Husband does not cite to or rely on this testimony, and he does not argue he presented any evidence as to the source of the $410,360.

evidence as to the source of the $410,360 in the Account, he has not overcome the presumption that the Account is marital property. *See id*.; sections 452.330.2 and .3; *see also Kauffman*, 101 S.W.3d at 46 (finding the husband failed to overcome the presumption that his share of an account was marital property where he offered no testimony as the source of the funds in the account). Therefore, the trial court did not abuse its discretion in classifying the Account as marital property and awarding Wife half of the value of the Account. *See id*.; *see also Landewee*, 515 S.W.3d at 694; *Cule*, 457 S.W.3d at 864-65; *Torrey*, 333 S.W.3d at 36. Husband's fourth point on appeal is denied.

## IV.    DISCUSSION OF WIFE'S POINTS ON CROSS-APPEAL

Wife raises four points on cross-appeal, which we will discuss in the following order. Wife's first, second, and fourth points on cross-appeal argue the trial court abused its discretion in classifying certain property as Husband's separate property on the basis it was acquired by gift. And Wife's third point on cross-appeal maintains the trial court abused its discretion in its valuations of PPI stock.

### A.    Whether the Trial Court Abused its Discretion in Classifying Certain Property as Husband's Separate Property on the Basis it was Acquired by Gift

Wife's first, second, and fourth points on cross-appeal challenge the portions of the trial court's judgment classifying the 49.5% ownership interest in Phoenix Wing and the 35 shares of voting common stock in PPI that Husband received on August 1, 2012 as Husband's separate property on the basis the ownership interest and shares were acquired by gift.

#### 1.    General Law and Standard of Review

As previously stated, "[p]roperty acquired during the marriage is presumed to be marital property, but a party may overcome this presumption if he or she shows the property is separate." *McQueen*, 507 S.W.3d at 151 (citing, *inter alia*, sections 452.330.2 and .3). The spouse asserting property is separate has the burden to overcome the presumption of marital property and

38

demonstrate by clear and convincing evidence that the property falls under one of the exceptions set out in section 452.330.2.  *McQueen*, 507 S.W.3d at 151.  Furthermore, if the complaining party meets this burden, the property is rendered separate.  *Id*.

One of the exceptions listed in section 452.330.2 is property which is "acquired by gift." Section 452.330.2(1); *England v. England*, 454 S.W.3d 912, 918 (Mo. App. W.D. 2015).  The elements of a gift are:  (1) a present intent on the part of the donor to make a transfer of property or funds; (2) delivery of the property or funds; and (3) "acceptance by the donee whose ownership takes effect immediately and absolutely."  *England*, 454 S.W.3d at 918-19 (quotations omitted); *see also Fike*, 509 S.W.3d at 802; *Clippard v. Pfefferkorn*, 168 S.W.3d 616, 618 (Mo. App. E.D. 2005).

Moreover, a party generally establishes a gift has been made if he shows:  (1) a voluntary transfer of property or funds has been made without an exchange of payment or services; (2) no prior obligation was thereby discharged; and (3) no future obligation was thereby incurred.  *See Hull v. Hull*, 591 S.W.2d 376, 380 (Mo. App. W.D. 1979); *cf. Preston v. Preston*, 189 S.W.3d 685, 690 (Mo. App. W.D. 2006) (holding a transfer of funds in exchange for services rendered is not a gift under section 452.330.2(1)); *Cochenour v. Cochenour*, 642 S.W.2d 402, 406 (Mo. App. E.D. 1982) ("[a] transfer is not kept from being a gift by payment of a trivial or nominal consideration, or if the consideration is insignificant compared with the value of the property transferred").

Whether or not property has been acquired by gift is a question of fact.  *Fike*, 509 S.W.3d at 802; *England*, 454 S.W.3d at 918; *Clippard*, 168 S.W.3d at 619; *In re Marriage of Michel*, 142 S.W.3d 912, 922 (Mo. App. S.D. 2004).  Accordingly, in determining whether the trial court has properly classified a spouse's property as separate on the basis it was acquired by gift, we defer to the trial court's credibility determinations and the trial court's assessment of the proper

39

weight to be given to witness testimony and documentary evidence at trial. *England*, 454

S.W.3d at 918-19; *In re Marriage of Fisher*, 258 S.W.3d 852, 857-60 (Mo. App. S.D. 2008);

*Clippard*, 168 S.W.3d at 619-20.

    2.    **The Portion of the Trial Court's Judgment Classifying the 49.5% Ownership Interest in Phoenix Wing as Husband's Separate Property**

We initially turn to Wife's first and second points on cross-appeal, which argue the trial

court abused its discretion in classifying the 49.5% ownership interest in Phoenix Wing as

Husband's separate property on the basis the ownership interest was a gift to Husband from his

Mother.

    a.    **Relevant Facts**

At trial, Husband argued the 49.5% ownership interest he acquired in Phoenix Wing was

gifted to him from his Mother, and therefore, the ownership interest should be classified as his

separate property. Phoenix Wing is a Missouri limited liability company formed during the

parties' marriage by Husband, his Brother, and their Mother. After its formation, Phoenix Wing

owned and managed commercial real estate in St. Charles County. Wife never had any

involvement in the company.

The operating agreement for Phoenix Wing ("Operating Agreement" or "Agreement"),

dated February 15, 2006, provides the members of Phoenix Wing are: (1) Husband in his

individual capacity; (2) Husband as trustee of his Brother's trust; and (3) Husband's Mother and

father as co-trustees of a trust. The term "Member" is defined in the Agreement as, *inter alia*,

"any [p]erson who has become a party to this Agreement, or who has been admitted to the

[c]ompany as a Member in accordance with this Agreement[.]" Husband executed the Operating

Agreement in his individual capacity. The Agreement provides Husband received a 49.5%

ownership interest in Phoenix Wing in the form of 4,950 Non-Voting Class B Units on February

15, 2006, a date which occurred during the parties' marriage.

On February 20, 2008, the date Husband's living trust was created, Husband transferred his 49.5% ownership interest in Phoenix Wing to his living trust. Based on this Court's review of the record, there is no evidence Mother or anyone except Husband and Husband's living trust ever had possession and dominion over Husband's 49.5% ownership interest, and there is no evidence that anyone attempted to have possession or dominion over the ownership interest.

Consistent with the evidence presented at trial, the trial court's judgment valued the 49.5% ownership interest in Phoenix Wing to be $1,325,372. Neither Husband nor Wife challenges this valuation in this appeal.

There was conflicting evidence adduced at trial as to how Husband acquired his 49.5% ownership interest in Phoenix Wing. On the one hand, the Operating Agreement indicates Husband received his 49.5% ownership interest in Phoenix Wing in February 2006 in exchange for Husband making a capital contribution of $247.50. In contrast, Husband testified at trial that his Mother gifted him his 49.5% ownership interest in Phoenix Wing in 2006, and he did not provide any capital contribution, money, or services in exchange for the interest.

> The portion of the trial court's judgment at issue in this point found in relevant part:
>
> [ ] Husband credibly testified his [M]other gave him 4,950 Non-Voting Class B Units of [Phoenix Wing] and that he provided no services to his [M]other, or to [Phoenix Wing] in exchange for these units. He also testified that he did not make a cash capital contribution, in any amount, to [Phoenix Wing] or to his [M]other in exchange for his 4,950 Non-Voting Class B Units of [Phoenix Wing]. The [c]ourt finds that this gift to Husband is consistent with the pattern of his [M]other giving him gifts of stock in family businesses.
>
> [ ] Although the [O]perating [A]grement to Phoenix Wing [ ] references a $247.50 capital contribution by Husband, he credibly testified that he never made this payment . . ..
> . . .
> [ ] On the basis of the testimony and documentary evidence noted here, the [c]ourt concludes that Husband has proven, by the credible evidence, that the transfer of the shares in [Phoenix Wing] . . . was without an exchange of payment [or services], that no prior obligation was discharged and that no future obligation was incurred. (quotations and citation omitted).

41

[ ] On the basis of the foregoing, the [c]ourt further concludes that [Husband's] 49.5% interest in [Phoenix Wing], now owned by Husband's trust, is the separate, non-marital property of Husband and must be set apart to him.

**b.      Analysis of Wife's Arguments on Cross-Appeal**

On cross-appeal, Wife argues the above portion of the trial court's judgment constitutes an abuse of discretion because, (i) it misapplies the law in that it violates the parol evidence rule; and (ii) it is against the weight of the evidence.  For the reasons discussed below, we disagree.

**i.      The trial court's judgment does not violate the parol evidence rule or misapply the law**

The parol evidence rule prohibits a court from considering extrinsic evidence that contradicts the terms of an unambiguous and complete written agreement absent fraud, common mistake, accident or erroneous omission.  *Norden v. Friedman*, 756 S.W.2d 158, 163 (Mo. banc 1988); *Mid Rivers Mall, L.L.C. v. McManmon*, 37 S.W.3d 253, 256 (Mo. App. E.D. 2000).  Wife argues that because the Phoenix Wing Operating Agreement unambiguously provides Husband received his 49.5% ownership interest in Phoenix Wing in exchange for Husband making a capital contribution of $247.50, the trial court's judgment relying on Husband's testimony to the contrary violates the parol evidence rule.

We find Wife's argument lacks merit because "[t]he [parol evidence] rule excluding extrinsic evidence sought to be introduced for the purpose of affecting a written instrument is applied *only where the controversy is between the parties to the instrument or to [those in privity with the parties to the instrument]*."  *Robson v. Diem*, 317 S.W.3d 706, 713 (Mo. App. W.D. 2010) (emphasis omitted and added) (quoting *American Bank v. Wegener*, 776 S.W.2d 922, 925 (Mo. App. W.D. 1989)); *Nieman v. First Nat. Bank of Joplin*, 420 S.W.2d 20, 22 (Mo. App. 1967) (emphasis added) (quotations omitted); *see Director of Revenue, State of Mo. v. Loethen Amusement, Inc.*, 753 S.W.2d 334, 335 (Mo. App. W.D. 1988) (similarly holding).  Because Wife is not a party to the Operating Agreement entered into by Husband, Husband as trustee of

42

his Brother's trust, and Husband's parents as co-trustees of a trust, and because Wife is not in privity with the parties to the Agreement, she cannot successfully invoke the parol evidence rule. *See Wegener*, 776 S.W.2d at 924-25 and *Loethen Amusement, Inc.*, 753 S.W.2d at 335 and *Nieman*, 420 S.W.2d at 22-23 (all similarly finding); *see also Robson*, 317 S.W.3d at 713. Under these circumstances, the trial court's judgment does not violate the parol evidence rule or misapply the law.

### ii. The trial court's judgment is not against the weight of the evidence

We now turn to Wife's argument that the trial court's judgment finding Husband's 49.5% interest in Phoenix Wing was acquired by gift is against the weight of the evidence.

A review of the evidence adduced at trial demonstrates that whether Husband paid consideration for his ownership interest in Phoenix Wing or received the interest as a gift was a contested factual issue. *See Fike*, 509 S.W.3d at 802; *England*, 454 S.W.3d at 918 and *Clippard*, 168 S.W.3d at 619 and *In re Marriage of Michel*, 142 S.W.3d at 922 (all providing that whether or not property has been acquired by gift is a question of fact). While the Operating Agreement indicated Husband received his 49.5% ownership interest in Phoenix Wing in exchange for Husband making a capital contribution of $247.50, Husband testified that his Mother gifted him his ownership interest in Phoenix Wing in 2006 and he did not provide any capital contribution, money, or services in exchange for his ownership interest. The portion of the trial court's judgment finding Husband acquired his ownership interest in Phoenix Wing by gift demonstrates the court considered the language of the Operating Agreement but gave the portion of the Agreement regarding Husband's alleged capital contribution little to no weight. Instead, the trial court gave more weight to Husband's testimony, explicitly finding his testimony to be credible and consistent with evidence adduced at trial that Mother had a pattern of giving Husband gifts of stock in family businesses.

43

The trial court's finding that Husband's 49.5% ownership interest in Phoenix Wing was acquired by gift is not against the weight of the evidence because the court could have reasonably found, from the record at trial, the existence of a fact that is necessary to sustain the judgment. *Day*, 528 S.W.3d at 412. Specifically, the trial court could have reasonably found from Husband's testimony and portions of the Operating Agreement that the elements of a gift were established in that, (1) at the time Phoenix Wing was formed in February 2006, Mother had the present intent to pay for Husband's capital contribution and resulting 49.5% ownership interest in Phoenix Wing; (2) the ownership interest was delivered to Husband through the execution of the Operating Agreement; and (3) Husband accepted Mother's payment for his capital contribution and resulting 49.5% interest in Phoenix Wing, immediately and absolutely becoming the owner of such an interest. *See Fike*, 509 S.W.3d at 802 and *England*, 454 S.W.3d at 918-19 and *Clippard*, 168 S.W.3d at 618 (all discussing the elements of a gift); *see also Prange v. Prange*, 755 S.W.2d 581, 593 (Mo. App. E.D. 1987) ("[w]here . . . a parent pays for property that is conveyed to her child[ ], an inference or presumption of a gift is raised"); *Linton v. U.S.*, 630 F.3d 1211, 1217 (9th Cir. 2011) ("LLC interests . . . are delivered through the execution of papers.").[23] Similarly, the trial court could have also reasonably found from Husband's testimony that, (1) a voluntary transfer of funds and/or property were made without

---

[23] Wife argues Husband failed to establish the element of delivery since Mother did not own the 49.5% ownership interest in Phoenix Wing before Husband acquired the interest. Wife fails to cite to any controlling authority for the proposition that a party has to own property before delivery of a gift can legally occur, and we can find none. Moreover, we find a valid delivery of property may occur under circumstances where, as in this case, no prior ownership of the property occurred, but there is evidence a parent pays for property, there is evidence the property is conveyed to her child, and there is no evidence the parent ever attempted to have possession or dominion over the property. *See Prange,* 755 S.W.2d at 593 and *Linton*, 630 F.3d at 1217 cited above; *see also In re Estate of Campbell*, 939 S.W.2d 558, 563 (Mo. App. S.D. 1997) ("[t]he test for delivery is whether the donor put it out of her power to repossess the property and relinquished dominion") (quotations omitted); *Kelly v. Maxwell*, 628 S.W.2d 931, 935 (Mo. App. E.D. 1982) (similarly providing); *Roth v. Roth*, 571 S.W.2d 659, 667 (Mo. App. 1978) ("[w]e approve the rule that less proof is required to show delivery as between parties within the family relationship") (quoting *In re Wintermann's Estate*, 492 S.W.2d 763, 768 (Mo. 1973)); *Clark v. O'Neal*, 555 S.W.2d 68, 71 (Mo. App. 1977) ("[a]s to the issue of delivery, no absolute rule can be laid down as to what will constitute a sufficient delivery to support a gift in all cases, for in each case the character of the delivery requisite to sustain the transaction as a gift will depend very largely on the nature of the subject matter of the gift and the situation and circumstances of the parties . . .") (quotations omitted).

44

an exchange of payment or services; (2) no prior obligation was thereby discharged; and (3) no future obligation was thereby incurred. *See Hull*, 591 S.W.2d at 380 and *cf. Preston*, 189 S.W.3d at 690 and *cf. Cochenour*, 642 S.W.2d at 406 (collectively providing a party generally establishes a gift has been made under these circumstances).

Furthermore, although the evidence adduced at trial posed two reasonable, although different conclusions, we must defer to the trial court's assessment of the evidence and credibility determinations with respect to the contested factual issue of whether Husband paid consideration for his 49.5% ownership interest in Phoenix Wing or received the interest as a gift. *See Day*, 528 S.W.3d at 412; *see also England*, 454 S.W.3d at 918-19 and *In re Marriage of Fisher*, 258 S.W.3d at 857-60 and *Clippard*, 168 S.W.3d at 619-20 (collectively providing we defer to the trial court's credibility determinations and the trial court's assessment of the proper weight to be given to witness testimony and documentary evidence at trial). Therefore, the trial court's judgment is not against the weight of the evidence. *See Day*, 528 S.W.3d at 412.

### c. Conclusion as to Wife's First and Second Points on Cross-Appeal

Based on the foregoing, the trial court did not abuse its discretion in classifying the 49.5% ownership interest in Phoenix Wing as Husband's separate property on the basis the interest was acquired by gift. *See Landewee*, 515 S.W.3d at 694; *Cule*, 457 S.W.3d at 864-65; *Torrey*, 333 S.W.3d at 36; *see also* section 452.330.2(1); *England*, 454 S.W.3d at 918. Wife's first and second points on cross-appeal are denied.

### 3. The Portion of the Trial Court's Judgment Classifying 35 Shares of Voting Common Stock in PPI as Husband's Separate Property

We next consider Wife's fourth point on cross-appeal, which contends the trial court abused its discretion in classifying 35 shares of voting common stock in PPI as Husband's separate property on the basis the shares were acquired by gift. Wife specifically asserts the trial court committed reversible error in admitting a 2012 federal gift tax return form purporting to

show the 35 shares were a gift to Husband from his Mother. For the reasons discussed below, we disagree.

### a. Relevant Facts

On August 1, 2012, a date which occurred during the parties' marriage, Husband acquired 35 shares of voting common stock in PPI. Husband's Mother had previously owned the 35 shares and passed away on November 1, 2012.

During one portion of Husband's trial testimony on December 7, 2015, he testified that during his Mother's lifetime, including in 2012, he received stock from his Mother and then transferred it to his living trust. Husband further testified on December 7 that he provided no services, money, or property in exchange for the shares of stock he received from his Mother, and he took absolute ownership of the shares when they were transferred to him. On that same, day, Husband also testified he was requesting the trial court classify all of the stocks listed on his Second Amended Statement of Property, including the 35 shares of voting common stock in PPI stock he acquired on August 1, 2012, as Husband's separate property because "those shares have been gifted to me."

During other subsequent points in Husband's trial testimony, (1) Husband testified that although he could not remember what he did on August 1, 2012, he had a "vague memory" of the 35 shares of stock being gifted to him; and (2) Husband admitted he stated in his pre-trial deposition that "I do not recall my mom gifting me shares in 2012."

In support of his claim that the 35 shares of voting common stock in PPI were gifted to him by his Mother, Husband introduced into evidence stock transfer pages of PPI and a 2012 federal gift tax return form ("2012 tax return" or "tax return"). The stock transfer pages of PPI reflect: 35 shares of voting common stock were transferred from Husband's Mother (as trustee of her living trust) to Husband in his individual name on August 1, 2012; and on that same date,

46

Husband transferred the 35 shares to his living trust. The trial court admitted the stock transfer pages of PPI into evidence, and its admission is not challenged on appeal.

The 2012 tax return purportedly provides that, *inter alia*, Mother gifted Husband 35 shares of voting common stock in PPI on August 1, 2012, with the shares having a value of $111,125. Wife objected to the admission of the 2012 tax return on multiple grounds, but the trial court overruled Wife's objections and admitted the tax return into evidence.

Subsequently, the trial court's judgment classified the 35 shares of voting common stock in PPI as Husband's separate property, finding in relevant part:

[ ] On August 1, 2012, Husband acquired 35 [ ] shares of voting stock in [PPI] . …

[ ] Husband credibly testified that these 35 shares of stock were gifted to him.
. . .
[ ] Husband supported his testimony with a 2012 [ ] tax return to prove the 35 shares were acquired as a gift . . ..

Finally, because the following is relevant to this point, we note the trial court's judgment also found, (1) there was a pattern of Husband's Mother giving him gifts of stock in family businesses; (2) Husband's Mother gifted him his original 15 shares of voting common stock in PPI on January 31, 2005; and (3) Husband's Mother gifted him 50 shares of non-voting common stock in PPI on December 31, 2006. Wife does not challenge any of preceding findings on appeal. Instead, Wife only claims the trial court abused its discretion in classifying the 35 shares of voting common stock in PPI as Husband's separate property on the basis the shares were a gift to Husband from his Mother, an argument which we now will consider.

### b.     Analysis of Wife's Argument on Cross-Appeal

Wife argues the portion of the trial court's finding the 35 shares of voting common stock in PPI were acquired by gift is erroneous because the 2012 tax return was inadmissible in that it lacked foundation and was not properly authenticated. However, even if the 2012 tax return constituted inadmissible evidence, that alone does not provide a basis for finding reversible error.

47

*See Andrews v. Andrews*, 452 S.W.3d 150, 154 (Mo. App. W.D. 2015) (similarly finding); *Love v. Love*, 72 S.W.3d 167, 173 (Mo. App. S.D. 2002) (similarly finding) (citing *Sanfilippo v. Sanfilippo*, 637 S.W.2d 77, 79 (Mo. App. E.D. 1982)).  "In a court-tried case, [the] erroneous admission of evidence only requires reversal where there is an absence of other sufficient competent evidence to support the [trial court's judgment]."  *Andrews*, 452 S.W.3d at 154 and *Love*, 72 S.W.3d at 173 (both quoting *Sanfilippo*, 637 S.W.2d at 79).  Missouri Courts have described this standard as being "practically impossible" to meet.  *Lunceford v. Houghtlin*, 326 S.W.3d 53, 69-70 (Mo. App. W.D. 2010) (quotations omitted); *Bolin v. Hanton*, 924 S.W.2d 15, 16 (Mo. App. E.D. 1996).

In this case, even assuming *arguendo* and for purposes of this appeal that the 2012 tax return was erroneously admitted into evidence, we find there is other sufficient competent evidence to support the trial court's finding that the 35 shares of voting common stock in PPI were acquired by gift.  Specifically, Husband's December 7 trial testimony, when viewed in full, provides Husband gave no services, money, or property in exchange for the 35 shares of voting common stock in PPI he received from his Mother on August 1, 2012, and he took absolute ownership of the shares when they were transferred to him.

This testimony constitutes sufficient and competent evidence to support the trial court's finding that the 35 shares were gifted to Husband from his Mother, especially when the testimony is considered with the undisputed pattern and history of Mother gifting Husband stocks in PPI.  *See Kauffman*, 101 S.W.3d at 42 (finding a husband's testimony coupled with other evidence constituted sufficient evidence that he acquired his interest in a company from his father by gift).  The trial court could have reasonably found from the preceding evidence that the elements of a gift were established in that, (1) at the time the 35 shares were transferred to Husband in August 2012, Mother intended to transfer the property, (2) the shares were delivered

48

to Husband; and (3) Husband accepted the shares, immediately and absolutely becoming their owner. *See Fike*, 509 S.W.3d at 802 and *England*, 454 S.W.3d at 918-19 and *Clippard*, 168 S.W.3d at 618 (all discussing the elements of a gift); *see also Kelly v. Maxwell*, 628 S.W.2d 931, 935 (Mo. App. E.D. 1982) ("[i]n the case of a transfer of stock to children . . . the law will raise a presumption of a gift from parent to child" and "courts freely indulge in presumptions in order to find the necessary elements of a gift") (quotations omitted). Similarly, the trial court could have also reasonably found from the evidence that, (1) a voluntary transfer of property was made without an exchange of payment or services; (2) no prior obligation was thereby discharged; and (3) no future obligation was thereby incurred. *See Hull*, 591 S.W.2d at 380 and *cf. Preston*, 189 S.W.3d at 690 and *cf. Cochenour*, 642 S.W.2d at 406 (collectively providing a party generally establishes a gift has been made under these circumstances); *see also Kelly*, 628 S.W.2d at 935.

Importantly, the trial court explicitly found Husband's testimony that the 35 shares were a gift to be credible. Although during some points of Husband's trial testimony he stated he had a "vague memory" of the 35 shares of stock being gifted to him and he admitted he stated in a pre-trial deposition that he did not recall such a gift, the trial court's decision indicates the court disbelieved these unfavorable portions of Husband's testimony and instead chose to believe and accept the other portions of Husband's testimony demonstrating the 35 shares were a gift. *See D.K.H. v. L.R.G.*, 102 S.W.3d 93, 98 (Mo. App. W.D. 2003) (similarly finding based on the principle that a trial court is "free to believe or disbelieve all, part, or none of the testimony given by any of the witnesses") (quotations omitted); *see also Day*, 528 S.W.3d at 411. We defer to the trial court's decision to accept and find credible the portions of Husband's testimony that he was gifted the 35 shares of voting common stock in PPI. *See id*.

In light of the presumption that a transfer of stock from a parent to a child is a gift, *see Kelly*, 628 S.W.2d at 935, we find Husband's testimony, coupled with the undisputed pattern and

49

history of Mother gifting Husband stocks in PPI, constitutes sufficient, competent, and substantial evidence to support the trial court's finding that Husband acquired the 35 shares of voting common stock in PPI as a gift from his Mother.

### c. Conclusion as to Wife's Fourth Point on Cross-Appeal

Based on the foregoing, even if the trial court erred in admitting the 2012 tax return, no reversible error occurred under the circumstances of this case, because other sufficient competent evidence supported the trial court's judgment. *See Andrews*, 452 S.W.3d at 154; *Love*, 72 S.W.3d at 173; *Sanfilippo*, 637 S.W.2d at 79. Therefore, the trial court did not abuse its discretion in classifying the 35 shares of PPI stock as Husband's separate property on the basis the shares were acquired by gift. *See Landewee*, 515 S.W.3d at 694; *Cule*, 457 S.W.3d at 864-65; *Torrey*, 333 S.W.3d at 36; *see also* section 452.330.2(1); *England*, 454 S.W.3d at 918. Wife's fourth point on cross-appeal is denied.

## B. Whether the Trial Court Abused its Discretion in its Valuations of PPI Stock

In Wife's third point on cross-appeal, which is the final point for us to discuss in this opinion, she maintains the trial court abused its discretion in its valuations of PPI stock.

### 1. General Law

"In a dissolution proceeding, the object of any valuation of a business is, of course, to determine its fair market value for purpose of application of the equitable distribution rules to arrive at a fair property division." *Thill v. Thill*, 26 S.W.3d 199, 203 (Mo. App. W.D. 2000). However, the characteristics that simplify the valuation of publicly-held stock, a ready market and historical sales record, are non-existent for a closely-held corporation such as PPI. *See id.* Accordingly, it is difficult to establish the value of stock of a closely-held corporation. *Id.* and *King v. F.T.J., Inc.*, 765 S.W.2d 301, 304 (Mo. App. W.D. 1988) (both citing *Hoffmann*, 676 S.W.2d at 826).

50

Because valuation of stock in a closely-held corporation is a factual determination to be made by the trial court, an appellate court defers to the trial court's superior opportunity to judge the credibility of the witnesses and the weight to be given to the evidence. *Thill*, 26 S.W.3d at 203; *King*, 765 S.W.2d at 304 (citing *Hoffmann*, 676 S.W.2d at 826). "No one formula or method of determining value is binding or conclusive." *Thill*, 26 S.W.3d at 203. In general, therefore, a trial court may accept the opinion of one expert as to value of a business and reject the opinion of another expert based on the particular facts and circumstances of the case. *Id.* (citing *Flarsheim v. Twenty Five Thirty Two Broadway Corp.*, 432 S.W.2d 245, 255 (Mo. 1968)); *King*, 765 S.W.2d at 304 (citing *Hoffmann*, 676 S.W.2d at 826).

## 2. Relevant Facts

During the parties' marriage, and specifically between January 31, 2005 and August 1, 2012, Husband acquired 235 shares of PPI stock and they were issued to Husband in his individual name. The 235 shares were subsequently transferred to Husband's living trust dated February 20, 2008. The 235 shares were comprised of 185 non-voting shares and 50 voting shares and, as of the time of the trial, the 235 shares represented a 23.5% ownership interest in PPI.

In this case, Wife and Husband each retained an expert witness to perform a valuation as to all outstanding shares in PPI and a valuation as to the 235 shares in PPI Husband acquired during the marriage. Each party's expert witness was a CPA, testified at trial, and prepared a valuation report that was admitted into evidence. It is undisputed both experts agreed that "fair market value" is defined as the price at which property would change hands between a willing buyer and a willing seller, neither under a compulsion to buy or sell and both having reasonable knowledge of relevant facts.

Wife's and Husband's experts disagreed on the value of all outstanding shares of PPI and the value of the 235 shares of PPI stock Husband acquired during the marriage. On the one hand, Wife's expert witness, Dale Brown, found the fair market value of all outstanding shares of PPI to be $19,215,000, and he found the fair market value of the 235 shares of PPI stock Husband acquired during the marriage to be $4,515,544. On the other hand, Husband's expert witness, Frank J. Reedy, Jr., found the fair market value of all outstanding shares of PPI to be $11,000,800, and he found the fair market value of the 235 shares of PPI stock Husband acquired during the marriage to be $2,608,190.

Wife presented evidence that, during the pendency of this case, PPI received a proposal from a company named Lincare, Inc. for the purchase of PPI for $25,200,000 ("Purchase Offer" or "Offer"). The Purchase Offer was signed and accepted by, (1) Husband's Brother in his capacity of one of the two owners of PPI; and (2) Husband in his capacity as the President and the other owner of PPI. The Purchase Offer explicitly provides: [T]his letter does not constitute the binding agreement of the parties, but is intended to serve as a basis for the negotiation and execution of a mutually satisfactory definitive purchase agreement." During subsequent negotiations between Lincare and PPI, Husband, his Brother, and another PPI employee collectively decided to terminate negotiations concerning the sale of PPI to Lincare, finding "it was not the best fit . . . [because] Lincare [did] not run their company like [they ran PPI], and [they] just felt at the time that [PPI] should call off the dating period and [the two companies should] go [their] separate ways." Accordingly, the sale of PPI to Lincare was never consummated.

In determining the value of PPI stock, the trial court declined to consider or adopt Wife's expert's opinions. The trial court also declined to give any weight to Lincare's Purchase Offer and the subsequent negotiations between Lincare and PPI on the basis that the sale of PPI to

52

Lincare was never consummated. Instead, the trial court explicitly found Husband's expert's opinions were credible and adopted his valuations of all of the outstanding shares of PPI and Husband's 235 shares in PPI. Consistent with Husband's expert's opinions, the trial court found the fair market value of all outstanding shares of PPI to be $11,000,800 and the fair market value of the 235 shares of PPI stock Husband acquired during the marriage to be $2,608,190.

### 3. Analysis as to Wife's Argument on Cross-Appeal

In this case, Wife argues the trial court's valuations of PPI stock "w[ere] against the weight of the evidence because the fair market value of PPI was conclusively established by an unsolicited offer to purchase by Lincare . . . for $25,200,000." We disagree.

As previously stated, no one formula or method of determining the valuation of stock in a closely-held corporation is binding or conclusive. *Thill*, 26 S.W.3d at 203. The methodology forming the basis of Husband's expert's opinion is unchallenged on appeal, and we defer to the trial court's decision accepting Husband's expert's opinions over Wife's expert's opinions and the trial court's explicit finding that Husband's expert's opinions were credible. *See Thill*, 26 S.W.3d at 203; *King*, 765 S.W.2d at 304; *see also Hoffmann*, 676 S.W.2d at 826; *Flarsheim*, 432 S.W.2d at 255. We also defer to the trial court's decision to give no weight to the Lincare's Purchase Offer on the basis the sale of PPI was never consummated, especially under the circumstances here where, (1) it is undisputed negotiations between Lincare and PPI had ceased by the time of the trial; and (2) there was no evidence Husband manipulated the transaction in order to benefit himself in the divorce proceedings. *See King*, 765 S.W.2d at 304 (citing *Hoffmann*, 676 S.W.2d at 826).

In sum, although the evidence adduced at trial may have posed multiple reasonable, although different conclusions, our standard of review requires us to defer to the trial court's assessment of the evidence and credibility determinations with respect to the contested factual

issues regarding the valuations of PPI stock. *See Day*, 528 S.W.3d at 412; *see also Thill*, 26 S.W.3d at 203; *King*, 765 S.W.2d at 304 (citing *Hoffmann*, 676 S.W.2d at 826). Furthermore, because the court could have reasonably found from Husband's expert's testimony that the fair market value of all outstanding shares of PPI to be $11,000,800 and the fair market value of the 235 shares of stock in PPI Husband acquired during the marriage to be $2,608,190, the court's valuations of PPI stock were not against the weight of the evidence. *See Day*, 528 S.W.3d at 412.

### 4. Conclusion as to Wife's Third Point on Cross-Appeal

Based on the foregoing, the trial court's valuations of PPI stock were within the range of conflicting evidence of value offered at trial, and therefore, the court's decision does not constitute an abuse of discretion. *See Hurst v. Hurst*, 553 S.W.3d 853, 859 (Mo. App. E.D. 2018) ("[w]hen the trial court's valuation of property is within the range of conflicting evidence of value offered at trial, the court acts within its discretion to resolve conflicts in evidence") (quotations omitted); *see also Landewee*, 515 S.W.3d at 694; *Torrey*, 333 S.W.3d at 36. Wife's third point on cross-appeal is denied.

### V. CONCLUSION

The judgment is reversed with regard to the classification of the 135 shares of non-voting common stock in PPI as marital property and the resulting division of property. In all other respects, the judgment is affirmed. The cause is remanded for proceedings in a manner consistent with this opinion.

_____
ROBERT M. CLAYTON III, Judge

Roy L. Richter, P.J., and
Angela T. Quigless, J., concur.

54